# WILLIAM ANDERSON v. VICTOR SATTERLUND.[1]

February 8, 1924.

No. 23,846.

**Question for jury whether defendant was guilty of malpractice.**
1. The evidence made the question as to defendant's negligence in caring for plaintiff as his physician one for the jury.

**Verdict for $5,750 not excessive.**
2. The damages awarded were not so excessive as to justify an appellate court in disturbing the verdict approved by the trial court.

Action in the district court for Ramsey county to recover $25,000 for malpractice. The case was tried before Boerner, J., and a jury which returned a verdict for $5,750. From an order denying his motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Briggs, Weyl & Briggs*, for appellant.
*Frank E. McAllister*, for respondent.

LEES, C.

Appeal from order denying the usual blended motion for judgment or a new trial after a trial by jury resulting in a verdict in plaintiff's favor for $5,750.

Defendant is a physician and treated plaintiff for a fracture of the femur of the left leg. The bone was broken on November 19, 1921, when plaintiff fell on an icy sidewalk in St. Paul. He was taken to a hospital and defendant was called to reduce the fracture. An X-ray examination showed a somewhat oblique break. Defendant testified that he placed the ends of the bone in apposition and applied a plaster cast extending the full length of the leg. Then a second X-ray examination was made, which showed that the ends of the bone were together, with only a slight projection at one edge. Two or three days later the cast was split. Strips

[1]Reported in 197 N. W. 102.

of adhesive tape across the fissure were used to keep the cast rigid, and sand bags were placed on each side of the leg to hold it in the proper position. Defendant visited the patient from time to time and by looking at his toes ascertained that the circulation of the blood was good. No weights were attached to the legs at any time, defendant being of the opinion that the cast would keep the ends of the bone together. On December 18 plaintiff told defendant that he had been moved during the night and that his leg did not feel the same as it had before. Immediately a third X-ray examination was made. It showed that the ends of the bone were overriding. Plaintiff was told of this and that the bone could be rebroken and reset. He declined to have this done, his objection being that he would be kept in the hospital too long. Nothing more was done and on January 10 defendant was dismissed and Dr. Teisberg called to take charge of the case.

When defendant first saw plaintiff and again when the third X-ray picture was taken, he advised him to have the leg opened and a metal plate attached to the bone to hold the broken ends together, but, on being told that there might have to be a second operation to remove the plate, plaintiff would not consent. When Dr. Teisberg took charge, he found some bowing of the leg at the point of the fracture. The bony union was reasonably good, but there was an overriding of about an inch and, as a consequence, the broken leg was shorter than the other. Dr. Teisberg characterized his subsequent treatment as "watchful waiting." It was still possible to rebreak and reset the bone, but he was of the opinion that it was best to let it unite as it was. Plaintiff remained in the hospital about 4 weeks longer, then returned to his home and about May 1 commenced to walk with a cane. He subsequently brought this action, charging defendant with negligence in the treatment of the injury.

The trial took place April 9, 1923. Plaintiff testified that the leg was improving, but was about 2 inches shorter than the right leg and was still weak. Dr. Clement Woolson furnished the expert medical evidence for plaintiff. His qualifications were considered in Berkholz v. Benepe, 153 Minn. 335, 337, 190 N. W. 800.

He testified that the X-ray pictures taken immediately after the bone was set showed that the broken ends were about 60 per cent out of line, and that the third set of X-ray pictures showed that they overlapped an inch and half or two inches. Defendant practices as an allopathic physician. Dr. Woolson gave it as his opinion that, judged by the standards of that school of medicine, plaintiff did not receive proper care and treatment because no extension weight was attached to the leg and because the position of the broken ends of the bone was not ascertained by the use of X-rays after the cast was applied. He testified that overlapping of the bone is inevitable, if the tendency of the muscles of the leg to contract is not overcome, and that this tendency is usually counteracted by the use of what is commonly known as Buck's extension. He expressed the opinion that a weight of 4 or 5 pounds should have been attached to the leg, but defendant's experts testified that a weight of not less than 30 or 35 pounds would have to be applied to have any effect. Dr. Woolson admitted that, if the ends of the bone had remained in the position shown by the second X-ray pictures, the result would have been a good one, because nature would have splinted the bone over and the broken ends would not have overlapped. With reference to the use of the X-rays after the fracture was reduced, he testified that a picture should have been taken within 2 or 3 days and others later, depending on what the first one showed, and that they should have been taken to ascertain whether the ends of the bone had remained in apposition. He admitted that one of the approved methods of treating a fracture of the femur is to use a cast such as defendant applied. Defendant's medical witnesses agreed that every fracture of the femur should be carefully watched when a plaster cast is used or when any other method of treatment is adopted.

A consideration of all the evidence leads to the conclusion that it was for the jury to determine whether the overriding of the broken ends of the bone resulted from defendant's failure to exercise proper care and skill. The evidence showed that in applying the cast he was following an approved method of treating a fractured femur; that it was not bad practice to use the cast without

attaching a weight to the leg; and that the ends of a broken femur cannot always be kept from overriding, no matter what method is employed to reduce the fracture. We rest the conclusion that the case was for the jury upon the evidence relating to the manner in which the patient was treated after the bone was set. There was an interval of 4 weeks between the date when the cast was applied and the date when defendant discovered that the broken ends of the bone were no longer in the proper position. During that period he seems to have assumed that the cast was holding the bone in the position shown by the second X-ray examination. When the ends slipped is left in doubt. Possibly it was not before December 18. It may have occurred immediately after November 19. It may have been a gradual process or it may have occurred suddenly, but this much is certain, there was constant danger of overriding. All the medical men agreed that a fracture should be watched closely. There might have been an X-ray examination without removing the cast. The event which happened was not so unusual that it could not have been anticipated. It would seem that defendant should have done something to ascertain from time to time whether the bone was uniting properly. At least the jury might find that in the exercise of reasonable care he should have done more than he did in this regard. The showing of a failure to exercise reasonable care and skill is not clear or convincing, but the evidence furnished a basis for a rational inference that there was negligence in the above mentioned respect.

Plaintiff is 52 years old. His occupation is growing bulbs and perennial plants for the market. He has suffered many injuries. His right leg had been broken twice and each of his arms once. It is urged that sympathy for his misfortunes influenced the jury and the result was an excessive verdict. He testified that he can no longer follow his usual occupation because he has to work on the ground, getting up and down frequently, and that his leg is in such a condition that he cannot do so without difficulty; that he still suffers pain, is lame and has a weak and deformed leg. Dr. Teisberg, who was his witness, testified that in time a useful bony union would be developed and that the only permanent disability

would be the shortening of the leg and some deformity. In Dr. Woolson's opinion the usefulness of the leg is 25 per cent below normal and the disability will be permanent.

The damages awarded seem large in view of the fact that the disability is due in part to the accidental injury for which defendant, of course, is not responsible. Considered, however, in the light of the principles stated in Ott v. Tri-State Tel. & T. Co. 127 Minn. 373, 149 N. W. 544, the verdict is not so excessive as to justify this court in interfering with it.

Order affirmed.