DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF WYOMING

[FALL TERM, 1925]

## WRIGHT v. CONWAY.*
(No. 1170; Dec. 8, 1925; 241 Pac. 369.)
(Rehearing denied; 242 Pac. 1107.)

PHYSICIAN & SURGEON—TRIAL—NEGLIGENCE—FAILURE TO USE X RAY
—BURDEN OF PROVING ADVISIBILITY OF X RAY—FAILURE TO SECURE
UNION OF FRACTURE NOT PROOF OF NEGLIGENCE—PHYSICIAN NOT
LIABLE FOR NEGLIGENCE OF NURSE—MALPRACTICE—EVIDENCE.

1. Evidence *held* insufficient to justify submission to jury of
   question whether surgeon was negligent in ascertaining
   location and nature of fracture of femur and treatment
   thereof.
2. On question involving a highly specialized art with respect
   to which a layman has no knowledge, court and jury must
   depend on expert evidence, and, in absence of such evi-
   dence, there is nothing to justify submitting issue to jury.
3. Where surgeon correctly ascertained location and nature of
   fracture of femur, his failure to use X-ray was not negli-
   gence.
4. Surgeon's failure to secure union of fractured femur *held*
   not to establish negligence, or even inference thereof; suc-
   cessful result not being guaranteed.
5. To establish surgeon's negligence in failing to use X-ray
   machine to ascertain location and nature of fractured femur,
   burden was on plaintiff to prove that such machine was
   available, or might easily have been procured.

6. Surgeon's failure to use X-ray, even if available, to ascertain location and nature of fracture in femur, is not necessarily negligence.

7. Evidence *held* insufficient to establish casual connection between surgeon's treatment of fractured femur and its ultimate shortened condition, but showed that such condition resulted from plaintiff's subsequent removal from hospital after surgeon was discharged.

8. Burden was on plaintiff to prove surgeon's negligence in treatment of fractured femur, and that such negligence was proximate cause of shortened condition thereof.

9. Surgeon, who advised hot applications, was not liable for burns caused by negligence of hospital nurse in applying hot bottles or irons, in absence of evidence that surgeon's relations to nurse were such as to make him responsible for her acts.

### ON PETITION FOR REHEARING.

10. That an X-ray apparatus was available and used 4 weeks after diagnosis and commencement of treatment *held* not to justify inference of its availability at time of diagnosis, especially where plaintiff could have established such fact by expert witness, called by him, at time of trial.

11. In malpractice case, burden was not on defendant to show that he could not secure an X-ray at time of alleged negligence in not using it.

12. Supreme Court cannot hold, without evidence, that X-ray instruments are so commonly owned and used by physicians in communities like Cheyenne, Wyo., as to justify inference of availability to physician, charged with negligence in not using one.

13. In action for malpractice in setting fractured femur bone, testimony of plaintiff's wife and expert witness *held* insufficient to justify inference, warranting submission of issue to jury, that fragments of bone were not in apposition during readjustment of plaintiff in bed in manner advised by defendant.

14. "Guesswork" cannot be substituted for evidence or "inference," which is a conclusion drawn on reason from premises established by proof, and, in a sense, the thing proved.

15. An inference cannot be based on a mere possibility or probability, but only on a fact proved or something known to be true.

16.  Submission of issue whether fragments of broken bone were in apposition during temporary lifting of weight and readjustment of patient in bed in manner advised by surgeon, sued for malpractice, *held* not warranted, in absence of proof of defendant's negligence.

*See Headnotes (1) 22 C. J. p. 663 n. 30; 30 CYc. p. 1546 n. 13; p. 1570 n. 19; p. 1572 n. 19; p. 1572 n. 31; p. 1573 n. 34, 35, 36; p. 1575 n. 50; p. 1578 n. 91; p. 1584 n. 49, 50; p. 1586 n. 63; p. 1588 n. 83; (2) 29 Cyc. p. 1555 n. 78 New; 30 Cyc. p. 1588 n. 83 (3) 30 Cyc. p. 1575 n. 56 (4) 30 Cyc. p. 1573 n. 36; p. 1588 n. 83 (5) 30 Cyc. p. 1584 n. 49; (6) 29 Cyc. p. 1575 n. 56 (7) 30 Cyc. p. 1587 n. 78 (8) 29 Cyc. p. 1584 n. 49, 50; 30 Cyc. p. 1581 n. 17; p. 1587 n. 78; p. 1588 n. 83; (9) 22 .C J. pp. 86, n. 75; 92 n. 47, 48; (10) 30 Cyc. p. 1584 n. 49; (11) 23 C. J. p. 60 n. (12) 30 Cyc. p. 1587 n. 78 (13) 23 C. J. p. 53 n. 84; 31 C. J. p. 1181 n. 17 (14) 23 C. J. pp. 19 n. 25; 55 n. 23; 56 n. 24; (15) 30 Cyc. p. 1588 n. 83.

ERROR to District Court, Laramie County; WILLIAM A. RINER, Judge.

Judgment for defendant, and plaintiff brings error. Rehearing denied.

*C. V. Garnett* and *Osmer E. Smith* for plaintiff in error.

The court erred in directing a verdict for defendant, plaintiff having established negligence; McCollum vs. Barr (Cal.) 176 Pac. 463; Baldwin vs. Gaines (Vt.) 102 Atl. 338; Swanson vs. Hood, 170 Pac. 135; Hickerson vs. Neely (Ky.) 54 S. W. 842; Tadlock vs. Lloyd, 173 Pac. 200; Peterson vs. R. R. Co. 70 Mo. 1c. 608; Krinard vs. Westermann (Mo.) 216 S. W. 938; Moehlenbrock vs. Parke (Minn.) 176 N. W. 169; Leisenring vs. La Croix, 94 N. W. 1009; defendant's negligence resulted in damages to plaintiff; Leisenring vs. LeCroix, supra; Eicholtz vs. Poe (Mo.) 217 S. W. 282; proof that plaintiff's leg was burned by hot applications was of itself sufficient to submit the cause to the jury; negligence may be inferred from the facts and inferences to be drawn therefrom; 29 Cyc. 622, Krinard vs. Westermann, 216 S. W. 938; plaintiff proved mal-apposition; McCollum vs. Barr, 176 Pac. 463;

the method of treatment was faultless but there was negligence in the use of that method; Swanson vs. Hood, 170 Pac. 135; failure to secure apposition warranted submission to the jury; Baldwin vs. Gaines, 102 Atl. 338; Schulte vs. Tasche, 165 N. W. 292; plaintiff was damaged without question. The law does not require direct and positive evidence of negligence, but it may be inferred from circumstances; 29 Cyc. 622 and cases cited; Kelley vs. R. R. Co. 70 Mo. 1; negligence may consist in not giving proper instructions or making frequent examinations after proper treatment given in the beginning; Miles vs. Hoffman, 221 Pac. 316; Howatt vs. Cartwright, 222 Pac. 496; timely use of X ray pictures are essential in the treatment of such cases; Anderson vs. Satterlund, 197 N. W. 102; James vs. Grigsby, 220 Pac. 267.

*C. L. Rigdon* and *D. J. Howell* for defendant in error.

When plaintiff produces evidence that is consistent with an hypothesis of negligence, and also lack of negligence, it tends to establish neither; Ewing vs. Goode, 73 Fed. 442; plaintiff was required to prove error in diagnosis resulting from negligence, the lack of skill, improper treatment and actual damage resulting therefrom; Willard vs. Norcross, (Vt.) 85 Atl. 904; McGraw vs. Kerr (Colo.) 128 Pac. 870; Osborn vs. Carey (Id.) 132 Pac. 967; Kernodle vs. Elder (Okla.) 102 Pac. 138; Nickerson vs. Gerrish (Me.) 96 A. 235; Von Boskirk vs. Pinto, (Nebr.) 155 N. W. 889; English vs. Free (Pa.) 55 A. 777; Wells vs. Ferry Lbr. Co. (Wash.) 107 Pac. 969; Dishman vs. Assn. (Wash.) 164 Pac. 943; Tomer vs. Aiken (Ia.) 101 N. W. 769; the diagnosis and initial treatment were correct; there was no evidence that would sustain a verdict to the contrary; Dye vs. Corbin (W. Va.) 53 S. E. 147; Miller vs. Toles, (Mich.) 150 N. W. 118; the overruling of the end to end apposition was the result of removing the patient from Cheyenne to Laramie; an X-ray would have added nothing to the diagnosis; the surgeon is required to exercise only his best judg-

ment as to the necessity or value of an X-ray in the case under treatment; Snearly vs. McCarthy, (Ia.) 161 N. W. 108; Beadle vs. Pains, (Ore.) 80 Pac. 903; negligence is measured by the customary practice and not by the practice of any single physician; Schumacher vs. Hospital (Mont.) 193 Pac. 397; Adolay vs. Miller (Ind.) 111 N. E. 313; Staloch vs. Holm (Minn.) 111 N. E. 264; Spain vs. Burch, (Mo.) 154 S. W. 172; plaintiff proved that partial apposition would ordinarily result in union. The basis of comparison is stated in Kernodle vs. Elder, (Okla.) 102 Pac. 138; a physician is never considered as warranting a cure, unless under a special contract for that purpose; his obligation is, that he possesses a reasonable degree of learning, skill, experience, care and diligence; extraordinary skill, diligence or care are not exacted; Dye vs. Corbin, (W. Va.) 53 S. E. 147; Sheldon vs. Wright (Vt.) 67 A. 807; Willard vs. Norcross (Vt.) 85 A. 904; Paulich vs. Nipple (Kans.) 180 Pac. 771; Spain vs. Burch (Mo.) 154 S. W. 172; Edwards vs. Uland (Ind.) 131 N. E. 240; DeBruine vs. Voskuile (Wis.) 169 N. W. 288; Adams vs. Junger (Iowa) 139 N. W. 1096; Hills vs. Shaw, (Ore.) 137 Pac. 229; Champion vs. Keith (Okla.) 87 Pac. 845; Dean vs. Seeman (S. Dak.) 176 N. W. 649; Lehman vs. Knott, (Ore.) 196 Pac. 476; Lawson vs. Conaway (W. Va.) 16 S. E. 564; a physician is not a guarantor of a cure; there is no presumption of negligence or want of skill for failure to cure; where a system used has the approval of even a respectable minority the physician's negligence cannot be disputed; Dahl vs. Wagner (Wash.) 151 Pac. 1079; Lorenz vs. Booth (Wash.) 147 Pac. 31; and cases cited; the burns complained of as resulting from hot packs applied by nurses did not establish negligence, nor create liability as against defendant, as he is not liable for the negligence of hospital nurses, if he had no connection with any negligent act; Broz vs. Omaha Assn. (Nebr.) 148 N. W. 575; Baker vs. Wentworth (Mass.) 29 N. E. 589; Reynolds vs. Smith (Iowa) 127 N. W. 192; Malkowski vs. Graham (Wis.) 172 N. W. 785; Morrison

vs. Henke (Wis.) 160 N. W. 173; Stewart vs. Manasses, 244 Pac. 221; 90 A. 574; Harris vs. Fall (Ill.) 177 Fed. 79.

POTTER, Chief Justice.

Damages are sought in this action for alleged malpractice of the defendant, when employed as a physician and surgeon to attend the plaintiff for an injury described as a fracture of the femur bone of his right leg. At the close of plaintiff's evidence in the district court a verdict was directed for defendant, and the cause is here on error for the review of the judgment rendered thereon. The several assignments of error each present substantially the same question; the sufficiency of the evidence to require its submission to the jury, upon charges of negligence in diagnosis and treatment, especially in a failure to use X-ray to aid diagnosis, and in burning the flesh of the leg by hot applications.

The fracture is conceded to have been simple and transverse, at a point about nine inches above the knee, at or a little above the junction of the lower and middle third of the femur. The facts of the diagnosis and treatment are related in the testimony of the plaintiff, his wife and his father, which may be introduced by stating that the method of treatment adopted was what is generally known to the medical profession as "Buck's Extension." The manner in which it was employed is first stated in plaintiff's testimony. He testified that his injury was the result of an accident while riding a motor-cycle on the race-track at Cheyenne, on the evening of June 10, 1921. That he was taken to his father's home in Cheyenne, the doctor called, and then removed to St. John's Hospital in that city. That he was unconscious until, at the hospital, he was conscious for a minute or so and saw his father and the defendant standing at the foot of the bed. That he asked the doctor if he had "got her all fixed up," to which the doctor replied, "Yes, sir, you are all right now." That upon fully recovering consciousness, he found:

"They had taken some boards and put underneath the bed, between the springs and the bed railing, so that there would not be any spring to the bed, and the bed was elevated —it was a little higher at the foot, I judge about three and one-half inches or four—and there was a weight tied on my right leg, and a sandbag up this side, from about here up to here (indicating) on the outside, and up about here on the inside (indicating). There was a strip of adhesive tape starting just above the knee, a couple of inches above the knee, and came down around my foot, and came up this side, just above the knee, and then it was bandaged below the knee, around this way (illustrating) to keep that tape from slipping, and he fastened the weight in the bottom of that tape that the rope was tied to that held the weight." That there were no splints along the side of the leg, nothing but the sandbags; that he heard them say that the weight attached to his leg was either 27 or 37 pounds; that his leg hurt all the time where the tape was, and it hurt underneath his leg and at his ankle. That the skin was not broken anywhere, but there was a blue mark about three inches above the knee on the outside. That he asked the doctor where the bone was broken, and he says "right under there (indicating) about three inches above the knee." "That is where this blue mark was."'

He further testified: Q. What treatment did he administer on these daily visits? Did he make any examination at all when he would come in? A. Sometimes he would throw the covers back, and look at it (the leg) and feel here (indicating) like that, and then walk away. Q. How many times did he measure your leg, during the five weeks that you were there, that you know? A. Once, that I know of. About eight days after I was in the hospital. Q. Tell the jury whether or not you ever felt a lump down on either side of your leg while in the hospital. A. Yes sir; eight days after I got hurt. Q. Where was that lump? A. Right about there (indicating); * * * about nine inches

above the knee. * * * It felt like a bone * * *
Just the same as if you bent your elbow and would feel
that end of your elbow. * * * That Dr. Conway, his
wife and father, and a couple of nurses saw and felt of the
lump, and that the doctor felt there two or three times,
shook his head and said "That feels like the callus on the
bone." He measured the leg then, but did not tell him
what the measurement was. About at the end of four
weeks, the leg began to swell; that the doctor said it was a
pure and simple case of phlebitis, caused from poor circula-
tion; that he ordered hot packs applied to the leg, "but it
kept swelling worse," and his leg was burned from the hot
water bottles. That X-ray pictures were taken after the
swelling developed, and after the second picture was taken,
he asked Dr. Shingle, who took it, if the bones were grown
together, and he shook his head and said "I don't think you
have got any union."

Covering the same matter, up to that point, the plaintiff's
father, W. F. Wright, testified that upon arriving at the
hospital the doctor, first, looked over the leg, "rubbed over
it a little, and told how he would have to fix that," (wit-
ness here describing the use of tape, weights, sandbags,
etc) ; "that the weight would draw the leg back in place and
would hold it in its natural position, to be careful and put
the sandbags up against him, and for him to lay still so as
not to take any chances of moving that leg out of place. I
asked him where the leg was broken, there was a blue spot,
evidently where he was hit between three and four inches
above the knee, and he said it was at that place where it was
broken."

That witness also testified about his son complaining of a
lump or knot underneath and about nine inches above the
knee, which felt to him (the witness) like a bone pressing
against the flesh, but the doctor said "that is just a callus
forming there." "He assured me all the time that there
was no occasion to be uneasy; that it was simply a straight
break,—what they call a pipestem break—a very easy mat-

ter to fix these things,'' and that he could be taken home in five weeks.

The testimony of Mrs. Wright was substantially the same concerning the appliances for reducing the fracture and holding the leg in place; also that when Dr. Conway arrived at the house he felt of the leg and said that the femur bone was fractured, and that he would have to be taken to the hospital. That he told her later that the bone was broken about three and one-half inches above the knee-cap. That on the eighth day, her husband found a lump underneath his leg, about half-way between the hip and the knee, which felt to her ''like your bended elbow, only larger.'' That when Dr. Conway felt of it he said that it was the bone callus, but that he wasn't quite sure because as a rule callus did not form within two weeks; that she asked him if he could not take an X-ray picture and make sure, but he said that he did not think it was necessary, that he could not get a machine, and Mr. Wright could not be moved to where there was one. But he measured the leg at that time and said that ''it was just exactly right.'' That there was no marked swelling until ''about four weeks'' later, when the leg swelled to about twice the normal size, extending throughout the upper portion. That she again asked if it was not possible to get an X-ray, saying to the doctor ''that we heard there was a portable machine in town,'' and he said that he would see. That an X-ray picture was then taken at the hospital by Dr. Shingle, but the negatives were reported to have been spoiled where they were taken to be developed. That two days later another picture was taken, and Dr. Conway did not let her see it, but said that it was very dim, and anyone not used to examining X-ray pictures could not make anything out of it, and he then explained to her the position of the bones by saying that ''the bones were practically perfectly straight, broke perfectly straight, what he called a pipe-stem break, and just the corners of the bone touched, like this, (illustrating).''

Mr. Wright, the father, testified that the doctor called the swelling of the leg phlebitis,—a clogging of blood vessels; that he, the witness, then spoke to the doctor about an X-ray, but he said "he had no machine, and didn't think it was necessary, but still he did not know about that swelling; was a little uneasy about it," and, later on, said that he had a notion to take a picture. That after the second picture was taken he went to the doctor's office, which was "the night before we took him away," July 12, since they took him away on July 13, "and I told the doctor that something had to be done; that the leg wasn't doing right. We had made arrangements to take him away, but I didn't say anything to the doctor about that. He started telling me about the leg, and what he proposed to do, and I let him go ahead before I told him that we had decided to take him away."

"He told me that he had been thinking it over and he says 'I have decided it would be all right to take the boy over to your house, he is so thoroughly dissatisfied and discouraged up there,   *   *   *   and I will take that leg— those bones are probably grown over, and rub them together until they are raw, and give them a new start, and keep that weight on and see what they will do, and if that is a failure we will have to take him to the hospital and operate on him. We will have to cut that leg open, and get those bones together and fasten them. That is what they call a compound fracture, and I would not want to do that without any further chances. I want to keep away from compound fractures; there is too much danger of blood poisoning.' I said something has to be done right away. He says, 'We will do that right away.'   *   *   *   I told him that we had called up a doctor in Laramie and made all arrangements to take him up there. He said he would advise against it, but it might not do any harm, and that is what we done."

It appeared also from the testimony of one or more of these three witnesses that when plaintiff was removed from the hospital at Cheyenne the weights attached to the leg

were removed, leaving only a board strapped to the leg that had been put there by the direction of Dr. Conway a few days before; that he was removed by being first carried from the hospital to an ambulance.—"They took the blanket he was on, or sheet, and lifted him right over into the stretcher"—from that at the train to the baggage car, where he rested on a spring cot, and from that at Laramie to a truck, and then to Dr. Turner's hospital. Dr. Conway was not present at the time of the removal, and did nothing connected with it, nor was he requested to be present or to give them any assistance in that matter. The plaintiff's father testified that while he did not in so many words discharge the doctor from the case the night before the removal, he supposed the doctor took it that way; and the petition alleges that defendant was discharged on July 13, 1921.

The nurse who attended the plaintiff at the hospital in Cheyenne during the first two weeks he was there, was called as a witness and testified about two matters only; one, the knot on the back of the leg, which she said felt to her like "just a hard lump," and the number of times in that period of two weeks that the leg was measured by the defendant. She recalled two such occasions very clearly, but could not recall whether he had or had not measured the leg in her presence more than twice.

Dr. W. K. Mylar was called and examined solely as an expert witness, and the only other witness was Dr. Turner, of Laramie, who was employed for professional care and treatment upon defendant's discharge and plaintiff's removal from Cheyenne. At this point we shall state some material facts of Dr. Turner's testimony. He testified that he had followed the profession of physician and surgeon for eighteen years,—fifteen years at Laramie. That upon a telephone communication from Mrs. Wright at Cheyenne, to the effect that the plaintiff was there with a broken leg, and they wanted to bring him home—"Laramie being his home"—he agreed to take care of him. He described the plaintiff's condition upon arriving at Laramie, his treat-

ment of the injured leg, and the result thereof, illustrated
by two X-ray pictures, the first one taken on the day after
plaintiff's removal to Laramie, and the other some weeks
later, following an open operation to fasten the fragments
of the bone together, made necessary because of failure of
efforts to maintain apposition by other methods, including
that of Buck's Extension; the fragments of the bone having
been found, as he testified, "overriding," when his first ex-
amination was made, on July 13,—a digital examination
and measuring the leg, confirmed the next day by the first
picture.    Asked on cross-examination if he had any diffi-
culty by ordinary tests and digital examination to ascertain
the point of the break, he said that he "believed he knew
where it was."    Also that he had no difficulty in determin-
ing that the bones were overriding, for the leg was several
inches shorter than the other, whereas both would have been
approximately the same length if there was no such over-
riding.   The picture aforesaid is a print and not very clear,
but we shall attempt a general description thereof by stat-
ing that the lower fragment of the broken bone appeared to
have slipped inward, that is to say, to the patient's left, on
an angle at the junction point of about 28 degrees, and pro-
truded upward beyond that point approximately two inches.

Dr. Turner testified also that after the open operation
the leg was short about half an inch, which increased later
because of "a little crook in it" at the point of the opera-
tion, produced by muscular contraction, "the heavy muscles
between the hip, the pelvis and the bones below the knee"
and the lack of continued sufficient weight upon the "Buck's
extension;" the weight having to be lessened at times, that
the patient might sleep.   That the patient remained at his
hospital until September 17, was thereafter confined to his
bed at his home in Laramie until November 5, and then for
a time used a wheeled chair.   Also that at the time of the
trial, in October, 1922, he had not entirely recovered, but
his condition would "in all probability" continue to im-
prove for a number of months, and that, while the leg was

not perfect it was a good serviceable one, in the opinion of the witness. We shall have occasion to refer to other matters in the testimony of Dr. Turner.

Before reciting the testimony of Dr. Mylar, the only expert witness (except Dr. Turner, within the limited field of his examination), we think it well to inquire as to the rules governing the civil liability of physicians and surgeons. They seem to be well settled. We take the following from Wharton & Stille's Medical Jurisprudence. A physician or surgeon is bound, impliedly, to possess, and to bestow upon the case in diagnosis and treatment, such reasonable skill and diligence as physicians practicing in similar localities and in the same general line of practice ordinarily exercise in like cases; to use his best judgment in all cases of doubt as to the best mode of treatment, and to bring to his aid "such obtainable remedies and appliances" as discovery and experience have found appropriate and beneficial in aiding recovery. Sec. 473. Malpractice is a negligent or unskillful performance of the duties which are incumbent upon him on account of his relations with his patients, or for the want of proper care and skill in the performance of a professional act. Sec. 499. He is liable to a patient for injuries resulting from want of ordinary skill or ordinary care, as well as for damages arising from negligence in the application of skill, and for want of ordinary care in diagnosis. Sec. 500. But he is not liable for a mere mistake of judgment, where he has exercised ordinary care and skill. Sec. 501. As thus limited, his liability does not extend to or include a guaranty of results, nor does he warrant a cure, unless such a liability is provided for by special contract. It is said in Zoterell v. Repp, 187 Mich. 319:

"The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, * * * and the bare fact that full recovery does not result, or that a surgical operation is not entirely successful is not in itself evidence of negligence."

The general rules are thus stated in Champion v. Kieth, 17 Okla. 204, 87 Pac. 845: "He is never considered as warranting a cure, unless under a special contract for that purpose. His contract, as implied by law, is that he possesses that reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession, that he will use reasonable and ordinary care and diligence in the treatment of the case which he undertakes, and that he will use his best judgment in all cases of doubt as to the proper course of treatment. He is not responsible for damages for want of success, unless it is shown to be the result of want of ordinary skill and learning, such as is ordinarily possessed by others of his profession, or for want of ordinary care and attention. He is not presumed to engage for extraordinary skill or for extraordinary diligence or care, nor can he be made responsible in damages for errors in judgment, or mere mistake in matters of reasonable doubt or uncertainty."

In Ewing v. Goode, 78 Fed. 447, granting a motion to direct a verdict for defendant at the close of all the evidence, Circuit Judge Taft stated certain rules which we think applicable here, viz:

"It is well settled that in such an employment the implied agreement of the physician or surgeon is that no injurious consequences shall result from want of proper skill, care or diligence on his part in the execution of his employment. If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery. Craig v. Chambers, 17 Ohio St. 253, 260. Mere lack of skill, or knowledge, not causing injury, gives no right of action, and no right to recover even nominal damages. This was the exact point decided in the case just cited.   *   *   *   Before the plaintiff can recover, he must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either ele-

ment is lacking in her proof, she has presented no case for the consideration of the jury.  *  *  *  A physician is not a warrantor of cures.  If the maxim 'Res ipsa loquitur' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician and surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for all the 'ills that flesh is heir to.' "

In Leighton v. Sargent, 27 N. H. 460, 59 Am. Dec. 388, discussing and applying the rule that mere error of judgment, using ordinary skill, is not a ground of liability, the court said:

"To charge a physician or surgeon with damages on the ground of unskillful or negligent treatment of his patient's case, it is never enough to show that he has not treated his patient in that mode, nor used those methods, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible, as much as the want of reasonable care and skill, for which he may be responsible.  Alone, it is not evidence of the latter, and therefore the party must go further, and prove by other evidence that the defendant had not the necessary knowledge and skill which entitled him to act, or,  *  *  *  that having such knowledge and skill, he neglected to apply them with such care and diligence as in his judgment, properly exercised, the case must have appeared to require; in other words, that he neglected the proper treatment from inattention and carelessness."

After quoting from that case the court, in Hesler v. Hospital Co., 178 Cal. 764, 174 Pac. 654, said that the law does not require that a physician's treatment should be certainly such as to obtain an approximately perfect result, but demands only that he use reasonable care to attain such ap-

proximate perfection. In 30 Cyc. 1584 it is stated that the burden of proof is on plaintiff to show the physician's want of reasonable care, skill, and diligence, and also that the injury complained of resulted from a failure to exercise these requisites; and at page 1588, that where the evidence is as consistent with the absence as with the existence of negligence, the case should not be left to the jury. See also Ballaine v. Drake, 224 Pac. 947, 98 Okla. 217; Getchell v. Hill, 21 Minn, 464, 3 W. & S. Med. Jur. § 500.

We find negligence on the part of the physician sometimes defined, generally, as consisting in his doing something which he should not have done, or in omitting to do something which he should have done. It is so defined in McGraw v. Kerr, 23 Colo. App. 163, 128 Pac. 870, wherein it was also said that the authorities are practically uniform in holding that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony; and that is the general rule. Ewing v. Goode, supra; Snearly v. McCarthy, 180 Ia. 81, 161 N. W. 108; Wood v. Barker, 39 Mich. 295, 13 N. W. 597; Farrell v. Haze, 157 Mich. 374, 122 N. W. 197; Olmstead v. Gere, 100 Pa. St. 127; Getchell v. Hill, supra; Wilkins' Admr. v. Brock, 81 Vt. 332, 100 Pac. 70 A. 572; Remley v. Plummer, 79 Pa. Super Ct. 117; DeBruine v. Voskuile, 168 Wis. 104, 169 N. W. 288; Paulich v. Nipple, 104 Kan. 801, 180 Pac. 771. So the negligence must appear from expert testimony, and that it caused the condition complained of, unless relating to a matter of common knowledge. Markart v. Zeimer (Cal.) 227 Pac. 683; Lorenz v. Lerche (Minn.) 196 N. W. 564; Pettigrew v. Lewis, 46 Kan. 78, 26 Pac. 458; Loudon v. Scott, 58 Mont. 645, 194 Pac. 488, 12 A. L. R. 187; Perkins v. Trueblood, 180 Cal. 437, 181 Pac. 642. And "neither of these conditions," failure to possess or use ordinary skill, or that the result complained of was brought about thereby, "should be supported merely by theory, conjecture, or inference, but they should be based

upon tangible, substantial evidence, which the court and jury may grasp and understand.'' Kernodle v. Elder, 23 Okl. 743, 102 Pac. 138.

It is in the light of these principles and the facts aforesaid that the testimony of Dr. Mylar must be considered. Having testified that he lived in Cheyenne, and was a physician and surgeon of nine years practice, a hypothetical question was propounded to him, stating that plaintiff had suffered an accident resulting ''apparently in a fractured femur bone,'' within an hour before defendant was called to attend him, purporting then to state the facts of defendant's examination and treatment, and concluding: ''Was or was not the treatment so administered the usual, customary, and accepted method ordinarily practiced by physicians and surgeons in this community?'' He said that he would have to answer in part, yes, and in part no. That fastening adhesive tape and fixing the lower part of the leg to obtain traction upon it, and sufficient resistance were placed so as to produce paralysis of the muscles, that reduction could be accomplished, which would probably be within a few days, was very correct. Taking X-ray was perhaps delayed. Putting the extension on was quite right. What was done was perfectly correct. But at the earliest possible time measurements, together with a radioscope, ''and this should be made often,'' to ascertain whether or not these bones were setting in their proper reduction; X-ray almost immediately, perhaps within two or three days.

Responding then to other questions calling for his opinion more in detail, or referring to phases of the hypothetical question not touched upon in the above answer, he testified substantially as follows: That in his opinion the knot or lump discovered on the back of the leg the eighth day ''would not have been callus that soon,'' and could have been attributable to ''one thing only—mal-apposition of the ends of the bones.'' That upon the discovery of such mal-apposition the usual procedure would be a further attempt

at proper reduction, which "perhaps would vary with the surgeon;" but where a proper attempt had previously been made, "according to the surgeon's judgment, to reduce this previously" X-ray should be taken to ascertain what was causing the separation of the bones. Q. What is the first result to be sought in handling a broken femur bone? A. Approximation of the fractured ends. Q. Is the mere application of an extension sufficient to produce that result? A. Ordinarily, splints on a thigh, with sufficient extension, is sufficient to paralyze the muscles to bring it down; ordinarily it would do that. Q. Within what time would the muscles be paralyzed so that the ends of the bones would be brought into apposition? A. I presume within a week, or less time; four or five days. Q. What should be done to maintain in that apposition? A. Continuous extension and splints. Q. In your opinion, is or is not the laying of a sandbag along each side of the leg the ordinary and customary practice to maintain apposition? A. That is followed by perhaps fifty percent of the doctors, especially, I presume, the older doctors in the practice. Q. Is it the modern practice of today? A. It is not the modern practice, No. At another place in his testimony he mentioned a "Thomas Splint," as though deeming that a more modern or preferable method. Asked concerning the swelling of the leg, he stated that it would probably be interference with returned circulation, resulting from "mal-apposition of the bones," or "perhaps traumatism of the surrounding soft parts." Stating his opinion as to the effect of the patient's removal to Laramie, he testified that if the bones were in apposition they probably would not slip; that it usually takes six to eight weeks for a fractured bone to heal so as to stand upon it, and at the end of five weeks there is a fibrous union,—strong enough to hold the bones in place as against ordinary jars, but not to bear any weight; and that, if the patient was kept in a horizontal position and with his leg on the board during the trip, "you would not expect the bones to slip."

On cross examination he was asked to state the first thing in the hypothetical question upon which he could form an opinion, and he answered that what first attracted his attention was the fact that the leg had been properly handled at the beginning, and contrarily handled a few days later. Responding to other questions in that connection, he testified: That the question did not inform him whether or not the bones had been manpulated and brought into apposition at the time the weights were attached. That the object of an X-ray picture in a fracture case is for proper treatment; and that "if you know what the proper treatment is, the exact condition, you have no use for an X-ray;" "though any doctor attempting to treat a fracture takes one." That from the hypothetical question he presumed that a Buck's Extension was used, and he described it as an extension upon the limb to paralyze or tire the muscles so as to approximate the ends of the fractured bones. Q. How would you determine that the bones were in apposition if not by an X-ray? A. You could not make sure. Q. Suppose the leg was the same length as the other? A. It might be, yet no proper apposition. Q. Suppose that by digital examination it was found to be in proper apposition? A. If the leg were small enough, you could form an idea, but could not tell positively. Q. Could you tell whether it was in apposition, though not necessarily complete? A. Yes, by measurement and manipulation. Q. Partial apposition is where the two ends do not come exactly together, but approximately? A. Yes. Q. Would there be a shortening if there was partial apposition in a transverse fracture? A. Partial apposition, end to end, No. Q. Suppose that the bones had been in partial apposition, could you have detected an enlargement on the side of the leg? A. That would make a difference of how much laceration there was of the soft parts, there might be things that enter into it. Q. There might be a dozen knots on that leg that would not have anything to do with the bone? A. I would not say a dozen. Q. Would you say

a half dozen. A. No. Q. There might have been quite a number of them? A. Yes.

On such examination he testified, also, that he was not informed by the hypothetical question whether there was union or non-union; that one of the chief causes of non-union is lack of apposition, or proper reduction of the fracture, or fragments of muscles or fascia between the ends of the bones. That where there is a badly lacerated leg, the result of direct violence, rendering the person unconscious, there is always some laceration of the soft tissue, which as a rule, in case of simple fracture, is a primary, common cause of what is known as phlebitis in the matter of broken bones. He was asked what he understood by the statement in the said question that the doctor "merely felt of the lump" discovered on the underside of the leg. He answered, perhaps just a casual examination, sort of "palpated the limb, not a very thorough examination." Q. Just put his hands on it, but made no examination? A. "There is certain knowledge to be gained by placing the hand on a fracture." Q. If, shown by measuring the leg, there was no shortening, what would you say as to apposition? A. That would not determine whether or not the bones were in apposition. Q. Would it not determine that there was no overlapping? A. Probably no overlapping if a transverse fracture. Q. Could there be overlapping if the legs were of the same length? A. Probably not, No. Q. Could there be as a physical fact? A. Assuming a transverse fracture, no. Q. Are there not a great many surgeons who would feel unfit to practice if they could not determine a simple fracture of the shaft of the femur at the point of the junction of the middle and lower third without the aid of an X-ray? A. I presume there are surgeons like that.

He was further questioned with reference to a union in a case of partial apposition, and first stating that the more direct the apposition, the more readily would be the union, he said that in case of a transverse fracture at the point in question, "you might get complete apposition without an

operation, but probably would not." That in such a case, if apposition could be maintained without too great deformity, it would be "quite all right;" but that there would be no deformity if there was complete apposition. He denied having attempted to state whether or not the defendant's treatment was right or wrong, saying that he did not know anything about his treatment and was not criticizing it; but was simply trying to answer questions pertaining to a fracture at the juncture of the middle third with the lower third of the femur. He agreed that the principle of traction is to get the leg in proper position, upon the proper kind of a bed, with a proper amount of extension, to overcome the contraction of the muscles; and that as soon as the traction has stretched the leg out to normal length, there will be proper apposition, in the absence of some intervening cause. Also that Buck's Extension is recognized by standard authorities and reputable physicians generally as a proper and skillful method of treatment, saying "it is stated in the authorities that it is a proper form of treatment for fractures of shafts of the femur."

On re-direct examination he was asked substantially this question: If you do not get apposition with Buck's Extension, it is not proper, is it? To which he answered: "No, sir," and testified again that the approved method of verifying the fact of complete reduction when Buck's Extension has been applied, is X-ray. And then: Q. I believe you testified the diameter of the femur was about an inch and one-sixteenth. Suppose on the lower fragment, (of a transverse fracture) an inch of that diameter is exposed and the other one-sixteenth covered by the upper fragment coming down, is that sufficient apposition to procure a union? A. If that should hold, if it were free between one-sixteenth, that really should hold if no great violence was put on it. Q. Suppose that instead of one-sixteenth of that diameter, none of it was covered, but the corners or the circumferences of the circles formed by the ends of those fragments simply touched on the sides that way (illustrat-

ing), in other words, the same as a lateral overlapping except that the bones were in that position, would you get a union? A. In time, if they were properly immobilized there would be some ossification around the sides of the fracture. Q. What sort of a union would that be? A. In time it might become a binding union.

It has seemed advisable to relate this much of the expert testimony, with the material facts disclosed by the other testimony, to make clear the situation, as it appears to this court, which confronted the trial court upon the motion to direct a verdict. For the question here is whether or not the granting of that motion was error. In Ewing v. Goode, supra, where a like motion was granted, the learned judge stated the question as follows:

"The preliminary question for the court to settle * * * is whether there is any evidence sufficient in law to sustain a verdict that the defendant was unskillful or negligent and that his want of skill or care caused the injury. * * * In many cases, expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts and accept or reject the statement of experts; as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of reaching conclusions from the facts when stated is not so different from the inference of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerning the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent upon expert evidence. There can be no other guide, and where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show

that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither." Citing L. & N. R. Co. v. East Tenn. V. & G. Ry. Co., 60 Fed. 993, 9 C. C. A. 314, and Ellis v. Railway Co., L. R. 9 C. P. 551.

It is said in Witthaus & Becker's Medical Jurisprudence, Vol. 1, page 83, that what constitutes reasonable care and skill is a mixed question of law and fact, like any other question of negligence; that where the evidence is undisputed and no conflicting inference can be drawn from the facts presented it is the duty of the court to determine whether or not there is sufficient proof of want of ordinary care and skill to be submitted to the jury. Now, in this case the evidence is undisputed, except as parts of Dr. Mylar's testimony may be thought at variance with statements in the testimony of Dr. Turner, and that, if it has any effect, will be in defendant's favor.

The averments of negligence here are few and, with a single exception, quite plainly stated. First, that defendant's diagnosis of the injury was improper and erroneous, in that he failed to ascertain the exact location of the fracture; that he failed to procure an X-ray photograph of the leg "to determine and ascertain the exact location and nature of the fracture;" that he failed to bring the broken ends of the bone into juxta-position so that they would or could unite; that he allowed the broken end of the lower part to extend alongside and above the upper part for two inches or less," and to remain in such position during all of the time" of defendant's treatment; that he failed to properly diagnose or determine that the broken portions were in that position, but diagnosed the enlargement pro-

duced thereby upon the leg as having been produced from other causes; that he carelessly applied hot applications to the leg in a careless and unskillful attempt to reduce the swelling and inflammation caused by the fragment of the bone to remain in the position aforesaid, thereby burning and blistering the skin and flesh of his leg from the knee to the hip. It is claimed, or was upon the trial, that the allegation of failure to take an X-ray photograph includes a failure in that respect to ascertain whether or not the bones were in apposition when the lump or knot was discovered on the back of the leg, and the failure then to use the X-ray is appellant's main contention here. That is the exception above referred to, as it is not clear that such failure at that time is directly alleged. But we shall consider it as at least incidentally covered by what is averred.

The alleged injurious results are: That plaintiff was compelled to discharge defendant and submit himself to other physicians and surgeons for treatment; to submit to the operation of opening his leg and the ends of the broken bone brought and held together by a "beef-bone splint;" which could not be and was not performed until his skin and flesh were healed from the effect of the hot applications; that he was confined to hospitals and his bed for many months, and compelled to incur large expense for hospital, medical and surgical attendance; that he suffered great pain and mental anguish; that his leg is permanently shortened and stiffened; and that his earning power has been permanently injured.

There is no substantial evidence to sustain the charge of failure to determine the exact location of the fracture. At the best it would have permitted merely a guess by the jury, based upon indefinite testimony aforesaid of the plaintiff, his wife and father, that defendant said the break was "about" three and one-half inches above the knee, or "where a blue mark was" "about three" or "between three and four inches above the knee;" each merely an estimate and allowing for mistake. The trial court saw the

plaintiff "indicate." We can have no knowledge of it, for it is otherwise unexplained in the record. How large was the blue spot—no doubt the surface indication of injury caused by the fall from the motorcycle? It could hardly have been a mere dot. To what part of it did the several witnesses refer in repeating the doctor's statement as to the place of the break, or to what part might we say that *he* referred, and just what did he mean by it? In view of the other evidence, and what he said at other times than that just mentioned, it may be regarded as merely casual, rather than admissions of lack of knowledge of the point of fracture.

He said other things strongly tending to show that he did determine correctly not only the nature but the location of the fracture. First, at the house, he felt of the leg and said that the femur was fractured. At the hospital he felt of the leg and said it was a straight break, what they called a pipe-stem break. That he ascertained and diagnosed correctly the nature of the injury is beyond controversy; all the evidence shows it. And we cannot well understand how he could have correctly ascertained the nature without at the same time discovering the location of the fracture. Another item of evidence to the same effect is that when defendant's attention was called to the lump underneath the leg, he declared it to be "callus," but later said that he was not sure, because callus does not form quite so soon. If callus, it must have referred to the point of fracture; yet, though the lump was nine inches above the knee, defendant does not seem to have been surprised to find evidence of callus there. Feeling of the leg at the house and at first at the hosptial was for the purpose of diagnosis. He must have felt of the leg considerably at the hospital, since the plaintiff was unconscious and the leg had to be placed in position and handled for the purpose of applying the Buck's extension; and he also felt of the leg upon the occasions of his daily visits thereafter, as the plaintiff testified. All this must have given the defendant much practical information

concerning the *location* as well as the *nature* of the injury. Indeed, he told what he discovered.

We have referred to Dr. Mylar's testimony that certain knowledge is gained by a surgeon in placing his hand upon a fracture, and also his testimony that he understood the statement of witnesses that the doctor felt of the lump or knot to mean that he had "palpated the leg, but without a thorough examination." To "palpate" the leg would mean, according to Webster's Int. Dict., to examine by touch, which also states that in medical matters "palpation" means physical examination by gentle application of the hand or fingers to the surface of the body to determine the condition of subjacent parts, as of a diseased organ. Dr. Turner testified, when asked how he knew that he had reduced the fracture: "Well, my measurements as to the length of the leg were correct, *by digital examination the bones felt in place*, and the X-ray picture showed them in place." In view of these facts, we are satisfied that to have submitted the evidence of mere uncertain estimates, when purporting to repeat what the defendant said, could have had no other effect than to tempt or persuade the jury to determine the matter by conjecture alone as against the salient facts aforesaid pointing to but one reasonable conclusion,—that the defendant did not err in locating the point of the fracture.

But the evidence fails further to show that the treatment was incorrect even upon the theory that the defendant erred as to the matter of location. There was an attempt to show that the extension may have been improperly applied upon that theory; but it fell far short of that. Dr. Mylar was asked whether it would make any difference in treatment if the fracture, instead of being three and one-half inches above the knee, was actually nine inches above that point. He said that it would, for the strips of tape should run up "as near as possible to the point of the fracture." That, alone, would not show that the extension was improperly applied, and indeed was uncertain, for "as near as possible" might

mean several things and be subject to several conditions. Nor was it made any more effectual by the cross examination. When asked to explain clearly the difference, he testified that the purpose, wherever the fracture, is getting and maintaining the ends in apposition, "immobilizing them;" that the treatment "differs in the way it is applied * * * for instance, in a Buck's extension, as Stimson has stated there, which is a very old authority on surgery, one is trying to keep the limb from rotating, by the use of the sandbags." Again he said that the difference would be "of getting the proper traction upon the lower fragment of the femur" because "the greater part of that femur you could control, the more you would be liable to immobilize it so as to get the proper union." But he nowhere said, nor, indeed, was asked to say, whether the tape, as put on in this case by the defendant, or the extension as applied by him, was in any way improper, in view of the location of the fracture at a point nine inches above the knee. And surely, under the rules above stated, such a matter could not properly be left to the jury upon the mere statement of the expert that the location of a fracture would make a difference in the manner of applying the extension, or his statement of the principle of control of the lower fragment.

Evidence is lacking also to show that the extension *as applied* was in any way a proximate cause of the alleged failure to maintain apposition or the alleged resulting injury. Nor is negligence in that respect alleged. Having correctly ascertained the location and nature of the fracture, an X-ray picture for that purpose was unnecessary. Snearly v. McCarthy, 180 Ia. 81, 161 N. W. 108; Hanson v. Harris, 44 S. D. 457, 184 N. W. 262. It was said in the Iowa case that the purpose in using X-ray being to diagnose the case, if this may properly be done without its use, "then no negligence is to be inferred from failure to use one;" and that the record showed that the nature of the fracture was discovered when defendant was first called, and "hence an X-ray examination would have added nothing." The court

said in Hanson v. Harris that the only fact that could have been ascertainable by an X-ray would be whether there was a fracture of any of the bones in or about the knee-joint, but it was wholly unnecessary for that purpose, because the defendant had ascertained that there was no broken bone there, and it was admitted on the argument that there was no fracture of any bone.

With the exception of the charge of burning the flesh by careless hot applications, the remaining charges may be considered together, since their effect is to charge negligence in failing to obtain and maintain apposition, and a determination thereof depends upon a consideration of substantially the same evidence. The alleged negligence in failing to use the X-ray prior to the time when it was used, and alleged negligence in diagnosis of the cause of the lump or knot aforesaid, will be included in this discussion. Indeed they are the only specific acts or omissions either alleged or brought out in the evidence to support the charge of negligence in failing to obtain or maintain the bone fragments in apposition so that they might properly unite. It cannot be too broadly stated, with respect to those averments, that, unless negligence consisted in the failure to use an X-ray within a few days after the initial treatment and occasionally thereafter during the first four weeks, and especially upon the appearance of the knot underneath the leg, which, according to Dr. Mylar's testimony, may have indicated mal-apposition of the bones, then there is no evidence of negligence in defendant's diagnosis and treatment.

Failure to secure a union during the period of that treatment, or even longer had it been continued, would not, alone, establish negligence or even be a ground for an inference thereof; since a successful result is not guaranteed, and the general rule is that an unsuccessful result does not alone establish negligence, or justify an inference thereof. That rule was applied in a case directly in point, Dean v. Seeman, 42 So. Dak. 577, 176 N. W. 649, where the court said: "It may be stated in the beginning that the mere

fact that the broken bone did not stay in place after it had been set and did not grow together in the usual length of time does not necessarily prove, nor even imply, that appellant was negligent or unskillful.'' And decisions upon the point to the same effect upon similar facts are numerous. Just what was meant by counsel or witness in the question on re-direct, above recited, that if you do not get apposition with Buck's extension it is not proper, and Dr. Mylar's answer thereto, ''No,'' we cannot say. If it was intended to cover a case where the method was entirely proper, and it was applied with ordinary care and skill, then the answer would not correctly state the law, whatever its standing as a statement of medical fact; and we incline, in such a case, to doubt its correctness in that respect. For it would then mean that propriety of treatment, or skill therein, must be determined by the result, making the practitioner a guarantor of success in all cases. We doubt that either counsel or witness intended that.

It is conceded in this case, and was admitted by the expert witness, that Buck's extension, described in the hypothetical question as applied in this case, is the standard and approved method of treating a transverse fracture of the femur, and that witness testified also that what was done in applying that treatment, including the sandbags at the side of the leg, would ordinarily bring the broken bone fragments into place and maintain them there until united by the natural process of growth known as a union. And later in his examination, when asked as to the probable or possible effect upon these fragments of the patient's removal to Laramie, he assumed that if the bones had been brought into apposition, and remained there, a sufficient union would have been formed at that time—five weeks after the accident and application of the extension—so that ''you would not expect'' them to slip. And among the malpractice cases in the reports are many showing an acceptance by the court, upon the basis of expert evidence, that in cases of such fractures Buck's extension is the generally approped meth-

od. See Kalloch v. Hoagland, 298 Fed. 252; Anderson v. Satterlund, 158 Minn. 205, 197 N. W. 102; DeBruine v. Voskuil, 168 Wis. 104, 169 N. W. 288. In one case where a "Thomas splint" was used, a method spoken of by the witness in this case as though deemed preferable, but whether when used, alone or in connection with the extension method does not clearly appear, the opinion in the resulting malpractice case showed that it had occasioned trouble, causing the substitution of a straight extension. Howatt v. Cartwright (Wash.) 222 Pac. 496. While it was held in Kalloch v. Hoagland, involving a fractured femur, that there was sufficient evidence to go to the jury upon the question whether the extension method was properly applied or not, there being evidence that the weights used were insufficient, and as to alleged negligence in failing to use an X-ray, the court said that no presumption of the want of reasonable care and skill in treatment could arise from the fact that it was unsuccessful; it appearing in that case that the fracture, simple and transverse, with a slight ripping off on the outside of the upper fragment, had never been reduced, but that the two ends of the bones had been allowed to lap in the neighborhood of two inches and to unite in that position. We perceive nothing in the evidence in this case that would justify its submission to the jury upon the theory that the extension had been improperly applied. The only possible ground for any other view—that in applying the extension defendant may have misunderstood the location of the point of fracture,—has been considered and disposed of as without merit.

It is not alleged, nor does it appear in the evidence, that an X-ray machine was available at any time prior to the use of one when the leg was found to be swollen, about, if not exactly four weeks after the application of the extension. The expert witness apparently assumed that one was available at all times mentioned in his testimony, or else intended to say that it should be used whether available or not. But the law does not exact the impossible of the medical

practitioner. And in the course of our investigation we have seen no case where the failure to use the X-ray was held to be negligence where it did not directly appear that such an instrumnt was available or there was no suggestion to the contrary. Negligence being charged in defendant's failure to bring to his aid this comparatively new apparatus, which we do not understand is yet recognized as a necessary or usual part of the equipment of a general medical practitioner's office, at least in the ordinary community, we think it was the plaintiff's duty, under the rule of the burden of proof in malpractice cases, to show by his evidence that such a machine or apparatus was available for defendant's use, or might at least have been easily procured.

That ought not to have been difficult if such an instrument *was* available. Certainly, if one was at the hospital, that might easily have been shown, or if in the office of any other practitioner in the city. Dr. Mylar, on his re-direct, was asked if he knew whether an X-ray machine was available at the time; but an objection as not proper re-direct examination was sustained. Yet the witness was not recalled, nor was any other witness interrogated about the matter. And it must be remembered that when X-ray was first suggested to defendant, he said that he did not think it necessary, but he could not get one, and the patient could not be taken to one; when it was again suggested, and that they had heard that a portable machine was in town, he said he would see, and then evidently found that Dr. Shingle, who took the picture, had one. But it does not appear whether that machine would have been available before that.

This view has ample support in the authorities. It is stated in Kalloch v. Hoagland, supra, where failure to use X-ray was alleged as negligence, that defendant admitted that within a week's time he could have had authority to get an X-ray picture by asking for it. In James v. Grigsby, 114 Kan. 627, 220 Pac. 267, cited by plaintiff, it is stated that one of the medical witnesses testified that a doctor would want to take an X-ray "if the hospital was equipped

with an X-ray machine;" and that the same witness, answering a question whether it would be negligent practice not to take such a picture, said that he did not think any physician could thoroughly answer the question unless he knew something of the circumstances of the case; and that another physician, testifying, stated that it would be proper to take an X-ray picture if there was a machine at the hospital, and "where it is accessible, I would consider it negligence not to take it." In Schumacher v. Hospital, 58 Mont. 447, 193 Pac. 397, it was held that a defendant was entitled to an instruction that the jury could not consider any reference to the failure to take an X-ray picture, unless plaintiff had proved that it was usual and customary "under the circumstances" for an ordinarily skillful and careful physician to take such a photograph; and it was stated in the opinion that the testimony of expert witnesses was to the effect that having an X-ray machine "at their disposal" they would use it if they had any doubt as to the existing conditions, but that it did not "disclose the necessity of the use of the X-ray except in case of doubt."

In McDonald v. Criver (Mo. App.) 272 S. W. 980, involving a dislocation of the ulna of the right arm diagnosed as a transverse Colles fracture of the radius, it appeared that defendant had no X-ray available at the time, and the court said, reversing a judgment for the plaintiff, that there should be testimony tending to show that a physician of ordinary skill in the locality, and "by the means at hand" could have discovered the dislocation or differentiated between it and a Colles fracture. An instructive case decided in 1918 is De Bruine v. Voskuil, 168 Wis. 104, 169 N. W. 288. A faulty setting of a fractured limb was alleged, and it was held, among other things, that failure to examine the bone by X-ray during treatment was not negligence, "no X-ray apparatus or suitable electrical current being available;" and a judgment for the plaintiff was reversed with directions to dismiss. It appeared that the defendant, on November 5, reduced the fracture, placed it in a fracture

box in the ordinary way with Buck's extension, and attached a weight of twenty-six pounds thereto; that on December 20 the apparatus was removed, a part of the weight having previously been removed. That, later, by ordinary examination, it was discovered that there was no union. The court, by Rosenberry, Justice, said:

"At the time of her injury plaintiff lived at Cedar Grove. There was no X-ray apparatus at or near that place, and there was no suitable electrical current available. Neither does it appear from the testimony that, had an X-ray picture been taken during the treatment, it would have shown that no callus was being formed at the point of the fracture.   *   *   *   Plaintiff's attorneys cite us to no case holding that it is, as a matter of law, negligence for an attending physician and surgeon to fail to avail himself of the use of an X-ray apparatus in the case of fracture, and upon the facts shown here we cannot so hold, particularly as in this case, it was comparatively easy to determine whether or not the ends of the bones were in apposition."

The failure to use X-ray, even though available, is not necessarily held to be negligence. The Iowa case of Snearly v. McCarthy, supra, seems to be much in point. It appeared there that the accident occurred while the plaintiff was riding a motorcycle, resulting in a simple oblique fracture of the femur of the right leg. He was taken to a hospital, a physician called, who then called the defendant, and the fracture was reduced while plaintiff was under an anaesthetic; and dressings and sandbags and extension straps were applied, and within twelve hours thereafter weights were added, followed by splints, and thus matters progressed as usual, apparently, for two or three weeks, when plaintiff thought he discovered a shortening of the injured limb, which, upon being measured, was found to be almost two inches short. Defendant then prescribed additional weight to the extension. After remaining in bed five or six weeks, plaintiff was allowed to sit in a chair, and later to

get around on crutches, pending which an ambulatory splint had been added to the extension, and after that a plaster-of-paris cast was put on, extending from below the hip to a point below the knee. At the end of seven weeks he was allowed to leave the hospital, and to put some weight upon the injured limb, and some of the cast was cut away. Plaintiff then noticed trouble, as if the bones were slipping past each other, whereupon, he was taken to another hospital and X-ray pictures were taken, when it was found that there had been no union of the fractured parts. Defendant then recommended an open operation and the use of the Lane plate, and that was done. Later the patient was taken to Dr. Murphy of Chicago, one of the most skillful surgeons of this country, where an X-ray was taken and another operation was deemed necessary and performed, another plate being put on, and a particular kind of splint. Four months later Dr. Murphy discovered that there was still no union, and there was another operation, which likewise resulted in no union, and a third operation, finally followed by a union, and the plaintiff's discharge with his injured limb considerably reduced in size and one and one-half inches shorter than the other. One of the claims in the case was that the defendant was negligent in not using an X-ray in aid of diagnosis before reducing the fracture and in not using it both before and after he performed the operation. The final result of the case was the affirmance of a directed verdict for the defendant. Among other things the court said that the testimony showed that it is entirely optional with physicians and surgeons whether to use the X-ray or not in the first instance, and that as to failing to use it when the shortening of the limb was discovered at the end of two weeks, there was no claim that the added weight to the extension was not the proper treatment, and that there was no testimony to the effect that it was proper or usual at such a time to use an X-ray to discover whether or not the bones were in apposition; but that as the court understood from the record, skillful treatment of a fracture during the first two

weeks demands that the injured limb be handled as little
as possible.   The court further said that until the expira-
tion of the usual period for a fracture to knit, there was no
suggestion of improper treatment, and nothing to indicate
any trouble, save the shortening of the limb, which was
sought to be corrected by the usual methods.   That it was
agreed by all that there was a non-union for six weeks and
more of treatment, and that the skiograph would have
shown nothing more, save the presence, perhaps, of some-
thing between the broken ends which prevented nature
from doing her work; "but this seems to have been imma-
terial because, whatever the immediate cause, it is not shown
to have been due to any fault of defendant, and all agree
that an operation was necessary, and that the kind of opera-
tion which defendant undertook to perform at that time
was the one demanded."

We are of the opinion that the court, in directing a ver-
dict in this case, cannot be held to have erred on the ground
or theory that the defendant was negligent in failing to use
the X-ray to discover whether or not the bones were in ap-
position, since no apparatus of the kind is shown to have
been available.   He measured the leg and found it all right,
and there seems to have been no further complaint to him
until the swelling occurred.   But there is a further reason
for that conclusion.   It does not appear that, even by the
use of such a machine, the bones would have been found out
of apposition.   While the expert witness testified that the
knot or lump underneath the leg could have meant only a
mal-apposition of the bones, he testified later on cross-ex-
amination, as shown above, that it might have been caused
by some other condition having nothing whatever to do with
the position of the bones; thus leaving it for the jury to use
its own judgment as to the cause of that lump—without any
certain expert knowledge as a guide, but with the fact be-
fore it that three weeks later the X-ray picture then taken
showed the bones to be at least in partial apposition, as we
understand the testimony of Mrs. Wright relating what

was said by defendant when explaining to her the position of the bones shown by that picture, viz: that the corner of the bones just touched "like this (illustrating)." What the illustration was we do not know. It is possible that plaintiff's counsel attempted to repeat that illustration when examining Dr. Mylar upon re-direct examination concerning the possibility of a union if the circumferences came together, as then illustrated by him, but which is otherwise unexplained in the record here. Whatever that position represented, Dr. Mylar testified that a binding union might result from it, which seems clearly enough to indicate at least a partial apposition. Certainly that did not tend to prove or to confirm the supposition that there was previously no apposition. The following cases, we think, support in the main our view respecting this matter. First we quote from Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564:

"Where the doctor has come up to that standard (the usual and customary practice of the ordinarily skilled and careful practitioner in the community), the law holds him free from damage claims, even though it appears that errors of judgment in diagnosis or treatment have occurred. The question for the jury is not what a certain practitioner may have done in a particular case. Hence, special care should be taken that verdicts in malpractice cases are not made to rest upon a generally expressed opinion that a course of treatment was improper, unless there is evidence reasonably disclosing some specific acts or omissions, which, under the standard mentioned, constitute negligence or unskillfulness, and, further, that such negligence or unskillfulness, in the opinion of the medical experts, caused the suffering and bad results for which damages are sought and allowed."

It is said in Wells v. Ferry-Baker Lumber Co., 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426, that the surgeon who testified that an X-ray photograph should have been taken, testified also that through his practice of twenty

years he had never had an X-ray machine, and that another surgeon said that the X-ray was used only as a matter of extreme care.   In Van Boskirk v. Pinto, 99 Nebr. 164, 12 N. C. C. A. 777, 155 N. W. 889, it was held that the evidence did not establish that the failure to take an X-ray picture as an aid to diagnosis constituted lack of reasonable care and skill under all the circumstances.   In Gramaldi v. Zeglio (N. J.) 129 Atl. 475, there was a directed verdict for the defendant, Zeglio, and the court in discharging plaintiff's rule to show cause, said:

"As the plaintiff did not respond to the treatment and his arm became restored to its condition prior to the fracture, it could be expected that a jury would reach the conclusion that some other treatment of the condition which arose should have been applied.   The result would be to return a verdict for the plaintiff, notwithstanding the same infection might have followed the other kind of treatment. If such were the law, there would be no physicians and surgeons who would undertake to treat a case.   For every failure to effect a cure would lay the basis for a law suit.   It takes more than the opinion of one or more physicians and surgeons that the treatment followed in a given case should have been different to lay a foundation for malpractice. The present case is typical of what frequently occurs.   The defendant has been a physician and surgeon since 1882. He is a graduate of the College of Physicians and Surgeons of New York City.   A reading of his testimony shows that he is a man of profound learning.   It shows a mastery of the subject.   To his learning is added an experience of over forty years.   *   *   *   A case of malpractice cannot be proven by the testimony of a few physicians or surgeons that they would have used other treatment, in the absence of testimony from which it can be inferred that the defendant failed to give to the case that skill and care ordinarily possessed and exercised by others in the profession."   See also a previous New Jersey case, Lowli v. Gray, 128 Atl..

256, a case involving a fractured femur, where a judgment
for plaintiff was reversed for error in not directing a ver-
dict for the defendant; the court saying that it was suffi-
cient to say that the diagnosis proved to be correct, and
that the medical testimony was that the treatment was in
accordance with standard medical and surgical practice.
Houghton v. Dixon, 29 Cal. App. 321, 155 Pac. 128; Mar-
kart v. Zeimer, 67 Cal. App. 363, 227 Pac. 683; Pierson v.
Crabtree, (Cal.) 232 Pac. 715; Saylor v. Brady, 114 Kan.
764, 220 Pac. 1047; Paulich v. Nipple, 104 Kan. 801, 180
Pac. 771; Ballaine v. Drake, 98 Okl. 217, 224 Pac. 947;
MacKenzie v. Carman, 103 N. Y. App. Div. 246, 92 N. Y. S.
1063; Kemp v. McGillivray, 129 Wash. 592, 225 Pac. 631;
English v. Free, 205 Pa. St. 624, 55 Atl. 777; Parker v.
Bower, 126 Atl. 522; Stoskoff v. Wicklund, 193 N. W. 312;
Nash v. Royster, 127 S. E. 356; Thorkildson v. Nicholson,
154 Minn. 106, 191 N. W. 269; Remley v. Plummer, 79 Pa.
Super. Ct. 117; Edwards v. Uhland, 193 Ind. 376, 140 N.
E. 546. In the case last cited it was held that if a physician
makes a mistake in his conclusion as to whether a sore place
on the skin has its origin in the flesh or in the bone under
the flesh, he is excused from liability if, possessing reason-
able skill, he has used ordinary care in making an examina-
tion, and has honestly reached the mistaken conclusion by
the use of such skill and such care.

While the record fails to disclose anything that was said
by the trial court when directing the verdict for the defend-
ant, and therefore does not disclose the particular ground
or grounds upon which the motion was granted, we are in-
formed by plaintiff's brief that the court stated orally as
the reason therefor the insufficiency of the evidence to estab-
lish any casual connection between plaintiff's condition un-
der the treatment of the defendant and the ultimate con-
dition for which damages are claimed. But in view of the
silence of the record this court would not be justified in dis-
posing of the case upon the assumption that the court acted
solely upon that ground. We are, however, of the opinion

that it would be a sufficient ground under the evidence in this case for the action taken by the trial court. We must accept the evidence as showing, at the time of defendant's discharge from the case, that the fragments of the broken bones, were at least in partial apposition, from which a union might have resulted. As part of that evidence is Dr. Shingle's statement that he did not think there was any union, answering plaintiff's question referring to the X-ray picture. But he did not say there was no apposition. Nor was he called by plaintiff to testify as to what was shown by the picture taken by him, or to produce the picture for use as evidence.

Upon discovering the situation disclosed by his X-ray picture, defendant proposed that he would bring the bones entirely together again and put them in a condition to induce the natural growth producing a union, or, should that prove unsuccessful, then to resort to an open operation,— substantially the same procedure adopted by Dr. Turner —preferring, however, to take the further chance of a renewal of the extension treatment before resorting to an open operation with the attendant danger of infection. While the expert witness in this case testified that there was no danger of such infection, we find several cases in the books showing that infection has occurred in cases of such operations, and several cases also reciting the testimony of expert witnesses that there is in such a case always danger of infection. See Kemp v. McGillivray, supra.

Defendant also advised against the plaintiff's removal, though saying that it might not do any harm. Certainly he cannot be held responsible for any harm that may have occurred thereby, and we think it clear from the evidence that harm may have occurred and that the removal may have been responsible for the resulting permanent condition for which damages are now claimed of defendant. It will be recalled that Dr. Mylar stated that, if the bones were in apposition at the time of the removal, considering that he had been under treatment in the neighborhood of five weeks,

you would not expect the journey incident to the removal to Laramie to cause them to slip. But his testimony in that respect shows that it was based upon the theory that there would have been at least a fibrous union. Yet it must be conceded, we think, that there was non-union at that time, but for which the defendant cannot be held responsible, his treatment having been the usual and customary method of ordinarily careful and skillful physicians in the community.

Dr. Turner, however, testified that if there had been at that time no union, then moving him would be very likely to move the fragments; and also that no extension weights were upon the leg when he first saw the patient, but only a board down the side as a splint, "for the apparent purpose of holding the leg comfortable while riding." He showed also the necessity of finally resorting to the open operation after several attempts with the Buck's extension and other apparatus and methods had failed to maintain apposition, and that even then union did not occur for an unusually long time. He testified that he had no means of knowing when he began to get union, but said, "you get motion, and when you have begun to get motion, the new bone is very flexible, and I could not tell that way, and the new growth. of bone does not have the appearance of bone in an X-ray picture, and the X-ray would not show, and I don't know when I began to get union. It was my opinion that I had union on October 14, 1921. That was from August 8, the date of the operation, to October 14."

As above stated, the evidence must be taken to show the bones in partial apposition when the services of defendant were dispensed with, and, against his advice, the plaintiff was removed to Laramie, under the circumstances related in the testimony. And therefore it must be accepted as showing that the slipping of the lower fragment of the bone into the position shown by the first picture at Laramie was a result of that removal. By reference to the general rules and the adjudicated cases, the burden of proof was upon

the plaintiff to show not only the alleged negligence but also that it was the proximate cause of the ultimate condition upon which the claim of damage is based. Having extended this opinion already beyond the length anticipated, induced thereby because the questions are of first impression in this court, we shall not discuss this matter further than to say that the burden was not, in our opinion, sufficiently sustained by the plaintiff to take the case to the jury upon the question of proximate cause.

One other question remains to be considered, the claim based upon negligence in the application of hot irons or bottles. It does not appear that the defendant did anything more than to suggest or prescribe the hot applications. It is not shown that he applied them, or that he was present when they were applied. If applied by a nurse at the hospital, there is nothing to show that her relation to the defendant was such as to make him responsible for that action. She may have been employed by the plaintiff. Without further showing than that found in this testimony, the defendant would not be liable for the burns or blisters resulting from such hot application. Makkaowski v. Graham, 169 Wis. 398, 172 N. W. 785; 4 A. L. R. 1524; Olson v. Bolstad, (Minn.) 201 N. W. 918; Perionowsky v. Freeman, 2 F. & F. 977.

In the English case last cited, an action for maltreatment at a hospital by two surgeons, it appearing that the alleged maltreatment was the administration of a hot bath which they had ordered, but which it was no part of their ordinary duties to perform, except to direct and superintend, and at the actual administration of which they were not present, it was held that the patient was not entitled to expect more than the usual and ordinary degree of care and attention at the hands of the surgeons, and that if they were not personally cognizant of the alleged ill usage, they were not liable. In the Minnesota case it appeared that defendant had directed that hot flatirons be placed about the plaintiff; that a woman em-

ployed by plaintiff's husband to attend her wrapped up
the irons and placed them in the bed, that two became
unwrapped and that plaintiff was badly burned. It was
held that the defendant was not chargeable with negli-
gence in relying upon the attendant to wrap them prop-
erly. The Wisconsin case cited is to the same effect. In
that case the court said that the defendant could not
have anticipated that an ordinarily prudent and intelli-
gent person would so place the iron as to cause the in-
jury complained of, and that where there is no evidence
to support the essential elements of reasonable anticipa-
tion, the proof will not be sufficient to make a case. Cer-
tainly there is nothing in this case to show any reasonable
anticipation on the part of the defendant that the hot
irons or bottles would be so placed about the plaintiff as
to cause the burning complained of.

For the reasons stated, the judgment will be affirmed.

*Affirmed.*

BLUME and KIMBALL, JJ., concur.

### ON PETITION FOR REHEARING.

POTTER, Chief Justice.

A petition for rehearing has been filed in this case.
Among other things it is asserted and argued that a cer-
tain portion of the evidence was overlooked in the opin-
ion, as well as some citation of authorities by the plaintiff
in error. Nothing of that kind was overlooked in the
court's consideration of the case. The item of evidence
referred to was not recited or specifically referred to in
the opinion for the reason that it was not believed by the
court to have any effect in the determination of the case,
and its inclusion in the recitation of the facts would
merely have added unnecessarily to the length of the
opinion. Indeed, as originally prepared the opinion con-
tained a statement thereof which was thereafter omitted
for the reason stated. We will take up that matter later.

It is, perhaps, true that all of the cases cited in the brief of plaintiff in error were not mentioned in the opinion, but we shall not take the time to make a comparison between that brief and the opinion to ascertain whether that is indeed the fact or not. Very many cases were examined by the court, whether cited by counsel or not, and several were not specifically mentioned in the opinion. The fact is, however, that the case received the most thorough consideration by the court. One authority which it is now said by counsel was cited in the brief and not in the opinion is Howitt v. Cartwright, 128 Wash. 343, 222 Pac. 496. But that case was cited in the opinion, though not upon the proposition for which it was cited in the brief. And it was thoroughly read and considered by the court.

Objection is taken to our stated conclusion that it was the duty of the plaintiff below, plaintiff in error here, to have shown the availability of an X-ray apparatus or machine in order to succeed in its charge that the defendant was negligent in failing to use it for the purpose of discovering whether or not the fragments of the bone were in apposition, or otherwise as an aid to diagnosis and treatment. And the case just mentioned, Howitt v. Cartwright, 128 Wash. 343, 222 Pac. 496, is supposed to have been overlooked by the court upon the question of negligence in the failure to use X-ray. It appeared in that case that such a machine was available, and had indeed been used at the beginning of the examination and treatment. And the charge of negligence was that the defendant had failed to use it sufficiently often. It was not therefore deemed to support the theory of plaintiff in this case upon the facts.

It is now argued that the point of the necessity of proof by plaintiff of the availability of an X-ray apparatus or machine was not discussed in the brief or argument of

either party, and that plaintiff should, on that ground alone, be granted a rehearing in order that it may be fully presented to the court. Such an argument would no doubt at times be persuasive, but in this case we see no ground for its application. A most thorough investigation of the authorities speaking upon the question of the use of the X-ray was made and we cannot apprehend that further argument would avail to convince the court that the matter of negligence in failing to use the X-ray should have been submitted to the jury, notwithstanding the failure to prove that it was available to the defendant under the circumstances. Beyond that, however, the proof in support of the charge of negligence was found to have been insufficient upon another ground, viz: that its use would not have demonstrated the truth of the contention of the plaintiff that the fragments of the broken femur bone were not in apposition, since the evidence shown by an X-ray picture made only a day before the discharge of the defendant from the case, as explained by the defendant to the wife of the plaintiff, as she testified, showed the bones to have been then at least in partial apposition.

The point is now made also that since an X-ray was found to be available and used four weeks after the diagnosis and commencement of the treatment, it would be a fair inference that the same instrument was available at all times before that, including the time of the diagnosis and beginning of the treatment. But we think that the case should not be disposed of upon any such ground, especially in view of the fact that if such a machine was available the plaintiff was in a situation at the time of the trial to have shown the fact, and, indeed, it appears that the matter was in the mind of counsel when Dr. Mylar, the expert witness called by him, was upon the stand, for, as stated in the former opinion, the question as to the availability of an X-ray machine was asked of that witness upon redirect examination, though he was

not allowed to answer because of an objection that the
question was not proper upon redirect examination, not-
withstanding which fact the witness was not recalled for
further examination.  But in view of the nature of the
subject we are clearly of the opinion that the suggested
*inference* of availability during the preceding four weeks
would not be the law.

While it is stated and recognized as a familiar general
rule (22 C. J. 86) that proof of the existence at a particular
time of a fact of a continuous nature gives rise to an in-
ference or presumption, within logical limits, that it ex-
isted at a subsequent time, a rule that proof of the exist-
ence of a *present* condition raises an inference or pre-
sumption that it existed at a *prior* time is not so generally
accepted.  Yet there are cases in which the *prior* exist-
ence of such a condition may be inferred or presumed,
depending upon the subject (id. 92).  We find a fair state-
ment of the principle, as to both prior and subsequent
existence, in Washington &c. Ry. Co. v. Vaughan, 111 Va.
785, 69 S. E. 1035.  The case there reported was an action
for damages for personal injuries suffered by a passenger
on defendant's line of electric railway, and one of the ap-
parently disputed facts was whether the electric and oil
headlights of the car were burning at the time of the acci-
dent.  And the question arose whether it was admissible
to show, by witnesses who saw the car about fifteen min-
utes *after* the accident, that such headlights were *then*
burning.  The court said:

"Where the existence of a thing at a given time is not
shown, its prior and subsequent existence is, according to
human experience, some indication of its probable exist-
ence at a later or earlier period.  The degree of probabil-
ity that a thing was in existence at a given time, from its
existence at a subsequent period, will depend upon the
likelihood of some intervening circumstance having oc-

curred and been the true origin. 1 Wigmore on Ev., Sec. 437.''

And with reference to the point in that case the court said that whether the length of time which had elapsed and the distance traveled was too great, was for the trial court, in the exercise of a reasonable discretion, and the appellate court could not say that it had not properly exercised its discretion in rejecting the offered evidence. In the section cited from Wigmore on Evidence, that author says:

''When the existence of an object, condition, quality, or tendency at a given time is unshown, the *prior existence* of it is in human experience some indication of its probable presence or continuance at a later period. The degree of probability of its continuance depends upon the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is not shown and the particular circumstances affecting it in the case in hand. That a soap-bubble was in existence half-an-hour ago affords no inference at all that it is in existence now; that Mt. Everett was in existence ten years ago is strong evidence that it exists yet; whether the fact of a tree's existence a year ago will indicate its continued existence today will vary according to the nature of the tree and the conditions of life in the region. So far, then, as the *interval of time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control. Similar considerations affect the use of *subsequent existence* as evidence of the existence at the time in issue. Here the disturbing contingency is that some circumstance operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will depend on the likelihood

of such intervening circumstance having occurred and to have been the true origin. On arriving at New York it can hardly be inferred that the steamer at the next dock has been there for a week, but it may usually be inferred that the dock has been there for some years; * * * Here, as with prior indications, the *interval of time* to which any inference will be allowable must depend on the nature of the thing and the circumstances of the particular case. * * * That no fixed rule can be prescribed as to the time or the conditions within which a prior or subsequent existence is evidential, is sufficiently illustrated by the precedents from which it is impossible (and rightly so) to draw a general rule. * * * The matter should be left entirely to the trial court's discretion.''

It was held in Barker v. Chicago, I. & L. Ry. Co., 51 Ind. App. 669, 99 N. E. 135, to be a reasonable inference that, because a switch was open at the time of an accident, it was open some thirty or sixty seconds before. The court in that case in addition to quoting from Wigmore and citing cases, quoted also the following from Chamberlayne on Evidence, Sec. 1030:

''To prove the existence of a fact or a continuous set of facts, is often in itself practically impossible. The most which can be done is to show its existence at a previous or subsequent period, and ask the tribunal to draw from this proof an inference that it existed at the time in question. The established rule is that the court will infer that a particular fact or set of facts continues to exist as long as such facts usually, as a matter of experience, have been found to exist.''

With reference to the subject in the case at bar, we think it cannot be said to have been practically impossible for the plaintiff to show whether or not an X-ray apparatus was available for the defendant's use prior to the

time when it was used. Hence the reason for the application of such a rule of inference or presumption as now contended for is absent here. The fact of availability, if it existed, might have been established, and seemingly without difficulty, leaving no reasonable ground for the application of the rule of inference with respect to the subject under consideration.

To have thrown the burden upon the defendant of showing that he could not secure an X-ray at the time when it was charged to have been negligence not to use it, would have placed upon him the burden of proving that he was not negligent. And that is not the rule in cases of alleged malpractice. Nor do we think we would be justified in holding, without evidence, that in communities like Cheyenne, such instruments were so commonly owned and employed by physicians as to justify an inference of availability on that ground alone; especially in view of the testimony that defendant said, when first interrogated about an X-ray, that he could not get a machine and could not take the patient to one. However, as already indicated herein, as well as stated in the former opinion, in addition to the absence of proof of negligence in the failure to use X-ray, and in other respects, there was also insufficiency of proof of any casual connection between any such failure as may have been claimed to exist and the subsequent condition for which damages were claimed in this action.

The evidence above adverted to as supposed to have been overlooked by the court when disposing of the cause by the former opinion was the testimony of plaintiff's wife and Dr. Mylar, the expert witness, with reference to the plaintiff's slipping down in the bed occasionally while at the hospital in Cheyenne, and the temporary lifting of the weight for the purpose of readjusting him in proper position. The fact was referred to in the former opinion that the foot of the bed was raised at the time

of the first treatment and the adjustment of the Buck's
extension to plaintiff's leg, a fact which we now mention
because of Dr. Mylar's testimony, now to be referred to in
connection with the testimony of Mrs. Wright.    Mrs.
Wright was asked upon her direct examination to state
what she knew about the plaintiff's slipping down in the
bed while he was in the hospital at Cheyenne.    Her an-
swer included a conclusion and a partial mis-statement,
though clearly not intended as such.    The direct answer
to the question was "Well, he had no braces or anything
to hold him in the bed, and naturally, a heavy weight on
one leg would pull him down, and he kind of slid down
in bed, and his foot would press against the foot of the
bed, and he would have a very hard time getting up in
bed."    That he had no braces to hold him in bed would
seem to indicate some thought of lack of attention, though
we doubt that that was intended.    And that the heavy
weight on his leg would pull him down, notwithstanding
that the foot of the bed was raised, and would be the
cause of his slipping would seem to be a mere conclusion
on the part of the witness, though perhaps not necessarily
untrue in fact.    She then testified that her husband asked
Dr. Conway what he should do about keeping up in bed,
and the doctor told a couple of nurses who were in the
room that it would not hurt to lift the weight just a trifle
and help him slide up in bed.    Asked whether she had
seen the weight lifted for that purpose, and if so what
she had observed when the weight was lifted, she testified
that she saw the weight lifted, and that the effect was the
same as if you stretched a piece of elastic; that when the
weight was lifted, the leg would kind of draw back, and
that when the weight was let down it would give—
"stretch out;" that she saw that happen "probably sev-
eral times."    Upon cross examination she was asked, in
that connection, "then the leg must have given a whole
lot when it was taken off entirely," referring no doubt to

the time and manner of the patient's removal mentioned in the former opinion. To which she answered "Yes, it did." That was all of her testimony upon that matter.

Dr. Mylar was asked whether loosening the weight on the extension and pulling the patient back into bed would be proper practice. and he answered that it would make considerable difference whether it was temporary lifting or permanent relief on the extension; and upon being advised that temporary lifting was meant, he testified: "A temporary lifting would be quite all right, to adjust the patient in bed." He was then asked whether, if the leg was observed to contract upon the lifting of the weight, and to expand when it was lowered, that would indicate whether or not the bones were in apposition. His answer was that "if the bones were in proper apposition, there would be no, as you describe, shortening of this limb upon temporary reduction of the extension, whatever it might be." He was then asked whether he would recommend lifting the weight without splints on the leg or without plaster casts or some other method of procuring immobility. And he testified that at the end of ten days · it would make very little difference, if there was proper approximation of the ends of the bones to raise the weights for a few minutes, "it would not hurt anything." Then in answer to the question at what time it would make a difference, he replied that with proper supports on the sides, and with proper reduction, it would make very little difference at any time; "that is, for temporary adjustment of the patient." Asked what the physician should do to prevent the patient from slipping down the bed, he answered that the usual procedure is something like raising the foot of the bed to counteract the weight pulling upon the foot, or fastening the patient some way to the head of the bed by a sheet.

The said procedure for readjusting the patient in the bed advised by the defendant as testified to by Mrs.

Wright is thus very clearly shown by Dr. Mylar's testi-
mony not to have been in any way improper. Nor was
that advised procedure charged in the case as one of the
grounds of negligence. But it is contended that in view
of Dr. Mylar's testimony that there would be no short-
ening of the limb "as described" if the bones were in
proper apposition, that this would have permitted a fair
inference that the bones were not in apposition at those
times, and required the submission of the case to the jury.
We cannot assent to that view. In the first place, the evi-
dence of Mrs. Wright was not sufficiently definite to have
given the jury a clear understanding of the situation to
render any conclusion upon it to have been otherwise than
a mere guess or conjecture. Guess-work cannot be sub-
stituted for evidence or inference, for "an inference is
the conclusion drawn on reason from premises established
by proof. In a sense, it is the thing proved. Guess-work
is not." Whitehouse v. Bolster, 95 Me. 458, 50 A 240.
More than that, the evidence in the case with reference to
the result of the X-ray picture taken just before the dis-
charge of the defendant and the removal of the plaintiff
to Laramie from the hospital at Cheyenne must be ac-
cepted, as stated in the former opinion, as showing that
the bones were not entirely out of apposition, even at that
time. The time of these various occasions when Mrs.
Wright noticed the temporary lifting of the weight and
the drawing back and expanding of the leg is not stated,
nor anything which in our opinion could be regarded as
more than the ordinary contraction of the muscles, which,
according to the testimony of Dr. Turner, are in a constant
state of contraction. There may have been a possibility,
or even a probability, that such movement of the leg upon
the occasions Mrs. Wright mentioned might indicate that
the bones were not in apposition or at least not completely
so. But an inference cannot be based upon a mere pos-
sibility or probability. It can only be based upon a fact

proved, or something known to be true. Seavey v. Laughlin, 98 Me. 517, 57 A. 796. Mrs. Wright was not an expert witness, and her said testimony cannot, as it seems to us, be deemed as sufficient to justify an inference upon which a verdict might properly be based, that the fragments of the bones were not at those times in apposition. But even if it might be held to have justified such an inference, upon what ground could it have been submitted to the jury in this case, there being no proof of negligence on the surgeon's part? The temporary lifting of the weight, and the readjustment of the patient in the bed, was shown not to have been negligence. And since no other negligence was established by any proof sufficient to take the case to the jury, there would be no reason for submitting the case upon the basis that this particular evidence would have shown the bones not to have been in apposition. The defendant would not have been responsible for any such condition except in case of proof of negligence on his part.

This seems to be all of the points made in the brief in support of the petition for rehearing calling for further discussion. This was the first case of the kind coming before our court. It was ably presented by counsel for both parties by brief and oral argument, and it was given our most careful consideration. We cannot believe that a rehearing could serve any useful purpose, and therefore we are constrained to deny the petition therefor.

*Rehearing Denied.*

BLUME and KIMBALL, JJ., concur.