## Cincinnati, N. O. & T. P. Ry. Co. et al. v. Humphrey's Adm'r.

Jan. 23, 1940.

F. A. Harrison for appellants.

L. M. Ackman for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

This suit was brought by the appellee, J. C. Mullins, administrator of the estate of S. R. Humphrey, to recover damages for his death, allegedly caused by the negligence and wilfull recklessness of the appellant railway company and G. W. Barry, the engineer operating its freight train at the time it ran over and instantly killed plaintiff's intestate.

At the close of plaintiff's evidence, defendant filed motion for a peremptory instruction, which the court overruled, and thereupon appellant proceeded with the introduction of its proof.

At the conclusion of all the evidence, defendant's motion for a peremptory instruction was renewed and again overruled, when the court, after refusing to give instructions "A" and "B" offered by the defendant, upon its own motion instructed the jury when, under the court's instructions and the evidence heard, it returned a verdict in behalf of Humphrey's administrator in the sum of $500.

From the judgment entered on that verdict, this appeal is prosecuted.

The decisive question presented upon the appeal is as to whether the appellant railway company was enti-

tled to a directed verdict on the proven facts presented upon the trial.

A due consideration and decision of this question calls for a synopsis of the evidence, on the alleged insufficiency of which appellant bases its contention.

The testimony of plaintiff's witnesses is to the effect that the decedent at the time of his death lived in a little village north of Dry Ridge in Grant County, Kentucky; that his home, located on the west side of defendant's right of way, abutted thereon, and across the right of way, abutting its eastern boundary line, was located the Dixie Highway; that over and along this right of way there ran two main tracks, the one on the west, next decedent's home, being described as the "north main track," while the other, next the Dixie Highway on the east, was called the "south main track," and that it was upon this latter track the decedent was running when struck and killed by the train.

Further, it is shown that for some time prior to Mr. Humphrey's death, he had been in poor health; that he suffered from both asthma and heart trouble and that this condition was badly aggravated by a sunstroke, which befell him as he was working in his tobacco patch about the last of August, or only a few days before the occasion in evidence, when he was struck and killed by defendant's freight train.

Decedent's wife testifies that following his sunstroke, he was very ill and "kinder dauncy" and that the whole night before he met his death, he had been delirious and that it had been necessary for her to sit up with him, to keep him quiet. She further states that on the afternoon in question, the decedent was up and dressed and appeared anxious to go and work in his tobacco; that he left the house, went onto the defendant's right of way and crossed the first or north bound track over to the farther or south bound track; that she ran after him and that just then the train approaching from the north began to whistle shrilly for Clark's crossing, some 1,300 feet or more distant; that her husband, upon hearing the whistle, hesitated for a moment and then turned and started running up the track, in the direction of the oncoming train, waiving his arms and staggering like a drunken man; that upon seeing this, being frightened for his safety, she screamed and ran after him, waving a red apron as she pursued him up the track, and that

her two daughters, hearing her screams, at once joined her in trying to overtake decedent before he met the train and save him from the imminent injury it appears they sensed awaited him.

They all testify that the intervening distance between the point on the railroad track where they first saw Mr. Humphrey and the point at which he was struck and killed thereon by the train was some 5½ rails or about 185 feet and that the distance between Clark's crossing, where the train whistled, and the point on the track where they first saw decedent was some 39 or 40 rail lengths, or some 1,300 feet. The daughters state that as they ran up the track with their mother, trying to overtake their father, she was waving her red apron and they were waving their arms and crying out, all trying to call the attention of the man in the cab of the engine to the peril of their father, who was running on the track towards the train, so that he might stop the train before it, as appeared imminent, should reach and run over him.

They state that as they were thus running up the track, they saw a man leaning out of the cab window, looking toward them, but they do not state at what point on the track they then were or how far distant was the approaching train from their father, or whether or not the train was then a sufficient distance away that it could have been stopped in time to have avoided running over their father. They only state that the train did not then or afterwards slow up and that it was only slowed up after it struck their father, when it was brought to a stop within a distance of ten rails from the point on the track where it struck him.

The co-defendant and engineer, Barry, the first witness called, stated that he was in charge of and operating this freight train, made up of some 82 cars, both loaded and "empties," upon the occasion in evidence when it struck and killed decedent; also, that the train whistled at the north or Clark's crossing, some 39 rail lengths from the place decedent was run over; that he never saw the decedent's wife or daughters as they ran along the track, or anyone on the track ahead until suddenly, "like a flash, a man appeared before us about 150 feet on the south bound main (track), running toward my engine;" that his expression was the most terrible he believed he had ever seen on a man's face; that his fireman at that point "hollered" to him to "look out,"

when he then immediately placed the brakes in emergency and gave the warning whistle; and that the train stopped in about 18 rail lengths, all told, from the time he saw the man 150 feet in front of him until they found his body under the thirteenth car of his train.

On cross-examination the engineer was asked if he made any move to stop the train before it was in 150 feet of decedent, to which he answered, "I had no reason—I did not."

The engineer further stated that he never saw the wife and daughters of decedent as they ran after him nor anyone on the track ahead other than the man his train struck, even though he further stated that from where the decedent was killed up to the Clark crossing, where he blew the train's whistle, the track is straight and the view ahead clear.

The fireman, Woodson, testified that:

"The first I seen of him (decedent), he come down off the pike on the north-bound main, about ten car lengths from where we was. * * * He run down the north main until he got about three car lengths of us, then he jumped over on our track that we are on and starts running towards us."

He further testified that the expression on decedent's face was terrible; that after the train struck him, they made a very quick stop of the train, decedent's body being found under the fourteenth car from the engine; that the decedent ran and jumped in front of the train, when he had come to within about three car lengths of it and that it would not have been possible to stop the train within the distance between it and decedent when they first discovered his presence on the track and thus have avoided hitting him.

He also stated that the train was going from 25 to 30 miles an hour.

There appears here no conflict in the evidence as to the mental condition of this unfortunate man, Humphrey, when upon this occasion he wildly rushed toward the on-coming train he saw as furnishing him the suicidal means he sought for deliberately sacrificing his life.

We do not by this mean to reflect upon the deceased when stating he followed this mad impulse, when it is obvious he was not, nor had been, in his right mind since suffering his recent sunstroke.

The family attest this to have been his condition by their testimony, as well as by their frantic apprehensions as to his impending peril, when they saw him rushing madly up the track of the approaching train.

This sparsely settled country, through which the train was here passing, was such as imposed no duty upon those in charge of the train of maintaining a lookout for trespassers along the tracks, where they had no right to be and whose presence there they were not required to anticipate.

However, as said in Louisville & Nashville Railroad Co. v. Horton, 187 Ky. 617, 219 S. W. 1084, 1087:

"The doctrine is well settled, in this state that although a person is a mere trespasser upon the track of a railroad, and is guilty of negligence in going or being thereon, and although the servants of the railroad are under no duty of keeping a lookout for him nor of giving him any warning of the approach of a train, nor of moderating its speed, nor of having it under control, nor is the failure to do any of these things negligence as to him, yet, if his negligence has resulted in putting himself in a place of peril of being killed or seriously injured by the train, and the engineer operating the train discovers the peril in time, by the exercise of ordinary care in the use of the means which he has at hand, consistent with the safety of the persons upon the train, to avoid injuring the trespasser, it is his duty to do so, and if he fails to exercise ordinary care to protect him from harm, and he is injured thereby, the railroad company will be liable for the damages. If ordinary prudence requires the train to be stopped in order to shield the trespasser from death or harm, it is the duty of the engineer to stop the train before coming in contact with the trespasser, if he can do so by the exercise of ordinary care with the means he has to do so. Louisville & Nashville Railroad Co. v. Benke's Adm'r, 176 Ky. 259, 195 S. W. 417; Louisville & Nashville Railroad Co. v. Davis, 162 Ky. [572] 578, 172 S. W. 966; Williamson & P. C. Railway Co. v. Charles' Adm'r, 168 Ky. [41] 42, 181 S. W. 614; Becker v. Louisville & Nashville Railroad Co., 110 Ky. 474, 61 S. W. 997, 22 Ky. Law Rep. 1893, 53 L. R. A. 267, 96 Am. St. Rep. 459; Louisville & Nashville Railroad Co. v. Bell, 108 S. W. 335, 32 Ky. Law Rep. 1312. Hence, to constitute

negligence on the part of the engineer of a locomotive attached to a train which injures a trespasser, it must not only be shown that he discovered the peril of the trespasser, but that he discovered it in time by the exercise of ordinary care, in the use of the means he had at hand, consistent with the safety of the persons upon the train, to avoid doing him an injury, and that he failed to do so.''

To the same effect was it further declared in McKinney's Adm'x v. Cincinnati, New Orleans & Texas Pacific Railway Co., 242 Ky. 167, 45 S. W. (2d) 1031, 1033, that:

''One going upon a railroad track in front of an approaching train so near that a collision cannot be avoided, even if his presence near the track is known to those in charge of it, cannot recover for injury or death. His sudden appearance in front of the train is the proximate cause of his injury or death. Louisville & Nashville Railroad Co. v. Cornett's Adm'r, 237 Ky. 131, 35 S. W. (2d) 10.''

Further, the appellant in the McKinney case insisted that because the son of deceased was of unsound mind and the deceased was at that time engaged in rescuing and returning him to his home, these facts made the case an exception to the general rule, which argument the court answered in the language of the opinion rendered in the case of Johnson's Adm'r v. Louisville & Nashville Railroad Co., 91 Ky. 651, 25 S. W. 754, which is as follows:

''In case the person is deaf, or otherwise deficient in his faculties, so as to render him unconscious of the impending danger, the knowledge of such infirmity must be brought home to those in charge of the train before they or the railroad company can be made liable.''

Continuing, the McKinney opinion states:

''According to this pronouncement, those in charge of the train had the right to regard and to treat the deceased and his son, in the absence of information to the contrary, as men of ordinary intelligence.'' (See cases cited therein.)

There is nothing here in the record to show that those in charge of the train had any information or

knowledge of Mr. Humphrey's mental condition on this occasion, and even had they discovered his presence further down the track than they did, they were not required, in the absence of information as to his mental condition, to anticipate that he would not abandon such unsafe place for one of safety. The unsound mental condition of the decedent, as, upon this occasion, he was recklessly rushing towards the on-coming train, being unknown to those in charge of defendant's train, it cannot be held to increase or change their duty owing him, nor make this case an exception to the general rule.

While it was not the duty of those in charge of defendant's train, as stated supra, to here maintain a lookout or anticipate Humphrey's presence on the track, yet, if they actually did discover him on the track and in a position of peril, when running towards the train and in a dangerous distance of it, it thereupon became their duty to at once exercise ordinary care and by using the means then at their command, to try to stop the train, if necessary, to avoid injuring him, under the duty imposed by the "last clear chance" rule or humanitarian doctrine; with the result that, if the engineer and those in charge of the train then failed to perform this duty so imposed on them, of exercising ordinary care, by using their means at hand, to protect Humphrey from harm, and by reason of such failure he was caused to be run over and killed, the railway company became liable in damages to his estate for his death.

Plaintiff's intestate was here a trespasser, to whom no lookout duty was owing by those in charge of the train, but witnesses for plaintiff state that the engineer or fireman did discover Humphrey's situation of danger, as they saw a man in the cab of the engine, as the train was approaching, looking towards them, but that he did not, upon his discovering their presence, try to stop the train, nor did he stop it until after it had run over and killed Humphrey.

However, the testimony of the engineer and fireman contradicts and is just the opposite of that of plaintiff's witnesses.

They state that after passing the Clark crossing, from which point to that where Humphrey was run over the track is clear, they, being under no duty to observe a lookout for trespassers on this portion of the track, did not see nor discover either the presence of plaintiff's

witnesses or that of the deceased Humphrey on the track ahead until he ran directly in front of the train, when only 150 feet from it, and that though they did everything they could and used all the means at their command to warn him of his danger and to stop the train, they were unable to do so before it struck him.

By the court's instruction No. 3, the jury was told that if it believed from the evidence the injury and death of plaintiff's decedent were caused by his own deliberate act, "when he was in his right mind and command in placing himself on the track in front of the oncoming train," the law was for the defendant and it should so find.

This instruction, so qualified, is obviously erroneous, since it makes the question of defendant's liability for running over decedent depend on what was his then mental condition, by its direction that if the jury believed that he was in his right mind when deliberately committing this suicidal act, by placing himself in front of the train, it should find for the defendant, for the reason apparently that if decedent realized the recklessness and folly of his act, he alone was responsible therefor.

On the other hand, by necessary converse implication, the jury was instructed that if Humphrey did not realize the nature and reckless character of his act in placing himself in front of the train, by reason of his then unsoundness of mind, the responsibility for his death was not his, but rested upon the defendant company, making it liable in damages for its train running over him, even though not caused by the defendant's failure to perform any duty resting upon it to prevent his injury and death.

The only duty resting upon the defendant and owing the deceased, when, it is conceded, he was a trespasser upon its track, was that imposed by the "last clear chance" rule, requiring those in charge of defendant's train, not to keep a lookout for a trespasser upon its track to discover if he had put himself in a place of danger, but only, if they did actually discover the presence of the trespasser or deceased on the track and that he was in a position of peril, to then seek to avoid injuring him by exercising ordinary care and using all the means at their command.

Such being the rule, the test as to whether or not the defendant company is liable for damages to Humphrey's

estate for his death, caused by the defendant's train running over him upon this occasion, is not what Humphrey's mental condition was at the time, but only was his death brought about by defendant's failure to perform any duty imposed upon it under the "last clear chance" rule.

Plaintiff's witnesses contend that the defendant did fail to perform the duty owing plaintiff's intestate and imposed by this "last clear chance" rule, for the reason that its agents did not, upon first discovering Humphrey's perilous position upon the track ahead, attempt to avoid injuring him by at once using the means at their command to stop the train before it reached and ran over him.

It is not stated in plaintiff's evidence as a fact that those in charge of the train did see the decedent, when in a position of danger upon the track ahead, at a point distant enough for them, by then exercising ordinary care and using the means at their command, to have stopped the train in time to have avoided injuring him, but, on the other hand, his witnesses merely state that they, as they were running up the track in an effort to overtake the decedent, saw some man (either the engineer or fireman) leaning out of the cab of the engine and looking towards them. They do not attempt to say how near the engine then was to the decedent.

This indefinite statement on the part of the witnesses, as to where the train was with respect to the decedent when they saw the engineer or fireman looking out of the cab of the engine, was made definite by the testimony of the engineer and fireman, who state that they did not discover the presence of decedent on the track until they were about 150 feet from him, when the fireman cried "look out" and the engineer placed the brakes in emergency and gave the warning whistle, but that they were then unable, by using all the means at their command, to stop the train before it struck and ran over the decedent.

Also it is argued for the plaintiff administrator that the track was straight and the view clear for a distance of some 1,300 feet from Clark's crossing and that this being so, those in charge of the train could have seen the decedent, and that therefore it may be inferred that they did see him and that they could have stopped the train in time to have avoided injuring him.

Plaintiff's argument, based on this character of evidence, was well answered in the case of Louisville & Nashville Railroad Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257, 258. There the court, in response to a like contention, said:

"The trouble with the contention of the administrator is that it fails to note the distinction between an inference and a suspicion. An 'inference' is a conclusion drawn by reason from facts established by proof; 'a deduction or conclusion from facts or propositions known to be true.' Parsons v. Baltimore B. & L. Association, 44 W. Va. 335, 29 S. E. 999, 67 Am. St. Rep. 769. An 'inference' is the conclusion drawn on reason from premises established by proof. Wright v. Conway, 34 Wyo. 1 [241 P. 369] 242 P. 1107. A supposition is a conjecture based on the possibility that a thing could have happened. It is an idea or a notion founded on the probability that a thing may have occurred, but without proof that it did occur. Conceding but not deciding that it was possible for the agents of the defendant to have seen this boy 924 feet before they struck him, there is no proof that they did see him at that distance or at any other point previous to the sounding of the alarm and the application of the brakes, which was 132 feet before the train hit him, or that, if he was seen sooner, his peril was discovered sooner."

The reason and ruling of this case has been time and again approved by this court as correct.

Instruction No. 3 being clearly erroneous, for the reason stated supra, and there here being no factual support for plaintiff's contention that those in charge of appellant's train did not, upon discovering the peril of the deceased Humphrey, at once exercise all the means at their command, as then became their duty, to avoid injuring him, it follows that the trial court's judgment must be, and it is, reversed.